## HEDRICK v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

### Division Two, March 29, 1906.

1. **PASSENGER ON FREIGHT TRAIN: Liability of Company: Drover's Pass.** Where a railroad company carries passengers for hire on its freight trains, it must exercise the same degree of care for their safety as is required in the operation of its regular passenger trains, the only difference being that the passenger on the freight train submits himself to the inconvenience and danger necessarily attending that mode of conveyance. And in this case a shipper of stock, under a live-stock contract, in charge of a car-load of stock, and riding in the caboose of the train carrying the stock, is assumed to be a passenger.

2. ——: ——: **Jarring and Jerking: Inferred Negligence.** It is a matter of common knowledge that jolting and jarring are incident to the operation of freight trains, and therefore negligence cannot be inferred from the mere fact that a passenger's injury resulted from a jar caused by the stopping of such train. The jar or jerk caused by the stopping of the train is not *ipso facto* negligence.

3. ——: ——: ——: **Slack of Train.** The freight train was very long and was very slowly approaching on up-grade a station where it was to take in another car. Plaintiff was riding in the caboose, and arose from his place of safety on the seat and moved towards the rear, with a view to getting off to assist in loading the other car, and just then the engine stopped and the rebound, from taking up the slack, violently jerked the caboose, threw plaintiff down and injured him. No announcement had been made and no one had told him to move. There was no evidence of any negligent act on the part of the brakeman or engineer, except that the train stopped a little more suddenly than customary; nor was there any evidence that the mere stopping of the engine in the usual way would not have caused the caboose, in a train of like length and on a like grade, to jerk or bump with equal violence; nor was there any evidence that the jerk was attributable to a defect in the track or engine or any car, or to unskillful handling of the engine by the engineer. *Held*, that plaintiff cannot recover.

4. ——: ——: **Res Ipsa Loquitur.** The rule of *res ipsa loquitur* applies only where there is something which, unexplained, tends to show that some negligence or omission of duty on the part of the carrier was the proximate cause of the injury.

Appeal from Johnson Circuit Court.—*Hon. W. L. Jarrott,* Judge.

REVERSED.

*R. T. Railey* for appellant.

(1) The undisputed facts failed to show any negligence on the part of either defendant or its servants. Defendant's demurrer to the evidence should therefore have been sustained. Wait v. Railroad, 165 Mo. 620; Bartley v. Railroad, 148 Mo. 141; Hite v. Railroad, 130 Mo. 141; Portuchek v. Railroad, 101 Mo. App. 52; Erwin v. Railroad, 94 Mo. App. 291; Saxton v. Railroad, 98 Mo. App. 503; Young v. Railroad, 93 Mo. App. 274; Shields v. Railroad, 87 Mo. App. 645; Guffey v. Railroad, 53 Mo. App. 468; Railroad v. Morris, 62 S. W. 1012. The plaintiff, as well as the trial court, seemed to be of the impression that the doctrine of *res ipsa loquitur* should be applied to this case. The rule relied on seems to be confined to that class of cases where a wreck occurred, or where the train jumped the track, or where something else transpired, which did not occur in the ordinary and usual management of ordinary freight trains. But in this case not a syllable of evidence appears which in the least indicates that the engineer was not skillful and careful in the management of the train. Nothing was wrong with either the roadbed or rolling-stock. In stopping such a train on a grade like this, from the very necessity of the case some slack would occur—of which fact the court would take judicial notice—and a sudden stop would be the result while the engine was stationary. On the facts in this case, it is submitted that if plaintiff had been on a regular passenger train—instead of a freight train with 20 to 25 loaded cars, stopping on a grade under the circumstances herein— he would have signally failed to make out a case of negligence in respect to the management of the train. We have been unable to find any

case, reported in any law book, where the plaintiff, under the circumstances detailed herein, has been permitted to recover damages. The trial court should have sustained our demurrer to the evidence, and having failed to do so, it is insisted that this court should reverse the cause, without remanding same. (2) There is no charge in petition to the effect that the engineer or any of the train crew were either incompetent or careless. *Omnia praesumuntur rite et solemniter esse acta.* Co. Litt., 6 b 332; 1 Phil. Ev. (Con. & Hill's Notes), p. 604, sec. 10; State ex rel. v. Bank, 120 Mo. 169; Yarnell v. Railroad, 113 Mo. 579; State ex rel. v. Williams, 99 Mo. 302; Mathias v. O'Neil, 94 Mo. 528; Hammond v. Gordon, 93 Mo. 226; Lenox v. Harrison, 88 Mo. 491; Bush v. White, 85 Mo. 356; Henry v. Dulle, 74 Mo. 451; Long v. J. M. & S. Co., 68 Mo. 431. Plaintiff in his testimony complains of but one jerk or jump. Plaintiff and his two witnesses said the stop was sudden, and unusual for a freight train to make, but this was simply an expression of opinion, and not a statement of any facts as to what the engineer was actually doing at the time. Bartlett v. O'Donoghue, 72 Mo. 564; Nugent v. Milling Co., 131 Mo. 252; Ferguson v. Davidson, 147 Mo. 668; Epperson v. P. T. C. Co., 155 Mo. 383; Wilson v. Jackson, 167 Mo. 155; Rice v. Smith, 171 Mo. 335; Koons v. Railroad, 77 S. W. 761; State v. Kaufman, 45 Mo. App. 659. (3) Plaintiff was riding on a stock pass, at time of alleged accident, and for a valuable consideration agreed to all the terms and conditions of same. Plaintiff was therefore bound by the terms of said contract and agreed to assume all risk of personal injury whatever, in passing along the caboose, while it was in motion, and as shown by his testimony at time of alleged accident. Kellerman v. Railroad, 136 Mo. 189; Catterlin v. Lusk, 98 Mo. App. 187; McNealy v. Baldridge, 106 Mo. App. 18; Bowring v. Railroad, 90 Mo. App. 330; Wyrick v. Railroad, 74 Mo. App. 412. (4) Plaintiff was on his feet and moving toward the rear of

caboose, while the latter was in motion. Under his stock contract he assumed all risk of injury while occupying this position. He knew it was more dangerous for him to occupy this position than if he had been seated. No signal had been given in regard to stopping. No trainman had called the station, invited plaintiff to alight, or had any conversation with him whatever. He got up from his seat of his own motion, while the train was moving and with full notice of the extra hazard which he was thus encountering. On his own admissions as well as on the undisputed facts, his own negligence not only contributed to, but directly caused the injuries— if any— which he sustained by the sudden stop or jerk complained of. Smotherman v. Railroad, 29 Mo. App. 266; Tuley v. Railroad, 41 Mo. App. 432; Harris v. Railroad, 89 Mo. 235; Carroll v. Railroad, 107 Mo. 653; Townsend v. Railroad, 61 S. W. 56.

*S. G. Kelly* and *O. L. Houts* for respondent.

(1)  Plaintiff's drover's pass made him a passenger on defendant's freight train and it became the duty of defendant to use the utmost skill and care which prudent men would use and exercise in like business and under like circumstances to transport him to St. Louis, the place of his destination, and to stop its train a sufficient length of time to enable plaintiff to get off in safety at the intermediate station of LaMonte on defendant's line of railway where plaintiff was required to stop to assist in loading a car load of hogs to be taken in the same train. The undisputed evidence shows that defendant caused its train to be slowed up at LaMonte until it was moving very slowly and until a number of the traincrew had got off, for the purpose of stopping and of allowing plaintiff, the only passenger, to get off; that in the presence of one of defendant's brakemen, in the caboose of the train, and without any warning or direction from the brakeman to

wait longer, plaintiff, who was then seated in the caboose, arose and walked toward the rear door for the purpose of getting off; and that before plaintiff had time to get off, and without any warning to him, defendant jerked or knocked or bumped with great, unusual, unnecessary, and extraordinary force, said train and caboose, and thereby injured him. · Upon this evidence the jury, under proper instructions, found that defendant's employees jerked or knocked or bumped with unusual and unnecessary and extraordinary force, the train and caboose, and that plaintiff was thereby injured while in the exercise of ordinary care upon his part, and rendered a verdict for plaintiff. The verdict was right. The act of defendant amounted to gross negligence in the management of its train, and its demurrer to the evidence was properly overruled. Carroll v. Railroad, 88 Mo. 239; Fullerton v. Railroad, 84 Mo. App. 498; Harris v. Railroad, 89 Mo. 233; Coudy v. Railroad, 85 Mo. 79; Wagoner v. Railroad, 97 Mo. 512; McGee v. Railroad, 92 Mo. 208; Whitehead v. Railroad, 99 Mo. 363; Jones v. Railroad, 31 Mo. App. 614; Richmond v. Railroad, 49 Mo. App. 104; Duncan v. Railroad, 48 Mo. App. 659; Railroad v. Horst, 93 U. S. 291. (2) There was no evidence that plaintiff was guilty of contributory negligence. Under the undisputed evidence, at the time plaintiff was injured he was in the caboose where he had a right to be, doing what he had a right to do, moving to the rear of the caboose for the purpose of getting off after the train had been slowed up by defendant, for the purpose of stopping at the station, and in order that plaintiff might get off. Fullerton v. Railroad, 84 Mo. App. 498; Harris v. Railroad, 89 Mo. 233; Coudy v. Railroad, 85 Mo. 79; Wagoner v. Railroad, 97 Mo. 512; McGee v. Railroad, 92 Mo. 208; Whitehead v. Railroad, 99 Mo. 263; Jones v. Railroad, 31 Mo. App. 614; Richmond v. Railroad, 49 Mo. App. 104; Duncan v. Railroad, 48 Mo. App. 659; Railroad v. Horst, 93 U. S. 291; State to use v. King, 44 Mo.

238; Buck v. Railroad, 108 Mo. 179; Blanton v. Dold, 109 Mo. 64; Hickman v. Link, 116 Mo. 123; Hoepper v. Southern Hotel Co., 142 Mo. 378; Impcamp v. Railroad, 108 Mo. App. 660; Kaiser v. Railroad, 108 Mo. App. 712; McAllister v. Barnes, 35 Mo. App. 674. (3)  The contract set out in the stock pass upon which plaintiff was riding had nothing to do with the case further than to show a consideration paid to the company for his transportation; plaintiff was not, therefore, by anything in the contract, precluded from recovering and the instructions based upon that contract were properly refused. Carroll v. Railroad, 88 Mo. 244; Settle v. Railroad, 127 Mo. 343; Blanton v. Dold, 109 Mo. 75; Meyers v. Railroad, 59 Mo. 230; Railroad v. Railroad, 78 Mo. App. 254.

GANTT, J.—This action was commenced in the circuit court of Johnson county on June 30, 1900, and defendant was duly served with process on that date. At the November term, 1900, the plaintiff filed an amended petition which is in substance as follows: That the defendant is a railroad corporation, operating a line of railway from the town of Knob Noster in Johnson county to the city of St. Louis, and was on the 22nd of January, 1900, a common carrier of passengers for hire, between the points above named, and on that date, for a valuable consideration received by it, received plaintiff into one of its said cars, to-wit, a caboose, in a freight train called a stock train, and undertook to carry him safely from Knob Noster to St. Louis. It is then alleged "That defendant disregarded its duty to so carry plaintiff, and by its agents, servants and employees at or near the town of LaMonte, while plaintiff was in said caboose and moving toward the rear end thereof and while said train and car were moving slowly, negligently and unskillfully mismanaged and operated said train and car, and engine, and carelessly and negligently, and with great and unusual and unnecessary

force and violence jerked, knocked and bumped said train and cars and said caboose, and with great and unusual and unnecessary force and violence knocked said cars against said caboose and that by reason thereof plaintiff was with great force and violence jerked, thrown down and against said caboose and was cut, bruised and wounded and permanently injured in his whole body, head, arms, neck, spine and limbs, so that he has been rendered unable to labor and has suffered and will continue to suffer through the remainder of his life great bodily pain and mental anguish, to his damage in the sum of twenty-five thousand dollars, for which he prays judgment."

The answers consist: first, of a general denial; and, secondly, as follows: "The plaintiff herein at the time and place of the alleged accident, was not upon defendant's train as a passenger, and had no legal right to be thereon; that said defendant was not guilty of any negligence in respect to any legal duty which it owed plaintiff; that said plaintiff was injured, if at all, by reason of his own gross negligence and recklessness in moving about upon defendant's train while it was in motion without any reason or justification therefor." Third, "That said plaintiff was guilty of gross negligence, not only contributing to, but directly causing his own injury, in that he was unnecessarily, negligently, and carelessly standing up or moving about in defendant's caboose while the train was in motion, and by reason of such negligence, recklessness and carelessness sustained the injury, if any, complained of, without the fault or negligence of said defendant."

The reply admits that the plaintiff was injured in the caboose of the defendant, and denied each and every other allegation contained in the answer.

The cause was tried at the November term, 1902, and a verdict returned for the plaintiff for five thousand dollars, and a judgment was rendered accordingly. Motions for new trial and in arrest of judgment were

filed in due time, heard and overruled at the October term, 1902. From that judgment, the defendant has appealed to this court.

The evidence tends to establish the following facts:

The plaintiff, Mr. Hedrick, resided, at the time of the accident, near Knob Noster in Johnson county; he was fifty-three years old. On the 20th of January, 1900, he started from Knob Noster with a car-load of hogs, belonging to Hanna Bros., on what is known as a stock pass. He took passage in the caboose attached to a freight train, bound from Knob Noster to St. Louis. There was no other passenger in the caboose but himself. The usual traincrew were in and out of the caboose from time to time until they reached LaMonte, a station east of Knob Noster, and near the western line of Pettis county. This train stopped at LaMonte to take in another carload of stock belonging to Hanna Bros. The plaintiff testified that he was requested by Hanna Bros. to look after a load of hogs when he got there. Mr. Jefferson Hanna was at LaMonte and had purchased a load of hogs from Mr. Oglesby, and he testified that Hanna Bros. gave a man by the name of Fowler a pass for the load of hogs taken on at LaMonte, and that he was loading the hogs into a car at LaMonte when this train arrived there, and Mr. Oglesby testified that he was assisting Mr. Hanna in loading the car at LaMonte, and from their evidence it would seem plain that plaintiff had nothing to do with the loading of the hogs at LaMonte; that they were practically loaded on the car when plaintiff reached LaMonte on the train that day.

Plaintiff's account of what took place at LaMonte was that after the train got to LaMonte it was *in a manner* stopped; two of the trainmen had already left the caboose, and the plaintiff got up and started to the rear end of the car, and there was a jump, he did not know what happened, but thought the train had collided, and for a moment or two he did not know what had happen-

ed and when he came to himself, he felt that he was injured, and sat down on a seat—went to a seat and sat down, and at that time the train was perfectly still. The caboose, after the train stopped, was in the neighborhood of a hundred or a hundred and fifty yards from the depot at LaMonte. He testified that when he came to himself, he was on his feet, and could not state whether he had been thrown down or not. He testified that he had traveled a number of times in cabooses attached to freight trains, and on freight trains, and he was then asked the effect that the stopping of the train had, and he answered, "The reaction on the car was so severe that it upset the water tank in the caboose and spilled water all over the floor." "That jar was severe — the severest I ever experienced on a freight train." "The extent was so hard it upset the water tank in the car." "It jerked me senseless and injured my neck." On cross-examination, he testified that when he started to go to the rear end of the caboose "the train was barely moving, it was not running one mile an hour; not near as fast as a man could run or walk, it was not going as fast as a man could walk, the rate of speed was so that a child could walk and get off if it had not been jarred." He was asked whether he was thrown down, and answered, "Well, I do not know whether I was or not, right there is where I never will be clear; I do not think I went to the floor. I was stunned for a minute or two." Asked whether or not he struck his head, neck or arm against anything in the caboose at that time, he answered, "I think I kind of caught myself on the — against the door casing or against the door as it swung, the jar was so violent and severe." He did not know where the brakemen were at the time of the accident. He described his injuries as follows: "Right from the center of my neck back here either of you jurymen can feel a rupture from my neck down; right there is a tender place (indicating); it is violently sore and I suffer all the time; I am never without a dumb sensa-

tion from my head over my right shoulder; it affects me clean down to my right foot at times. My natural way of sleeping is on my back, I cannot sleep on my back. I have got to sleep on my left side to get any sleep, and if I happen to turn upon my back, the pain gets so severe it wakes me up, as high as a half dozen times in the night. I am not able to perform manual labor on account of my right side; the pain runs from my ear down to the center of my neck; cannot turn my head without turning my body without causing it to hurt; I cannot turn my head from right to left without hurting my neck. I am in pain all the time in my neck and head; when I get a little bit warm the pain is more severe; my right arm and right side is not stout; I can hardly put on my clothing. Before I was hurt, I was a stout, able-bodied man, now I cannot perform my customary work on the farm."

On cross-examination, witness identified the live-stock contract between the railroad company and Hanna Bros., which provided that plaintiff should be in charge of the carload of stock as the agent of Hanna Bros. The 9th provision of the contract provides "that the person or persons in charge of live stock carried by this contract shall remain in the caboose car attached to the train while the same is in motion, and whenever such person shall leave the caboose car or pass over or along the cars or tracks, he shall do so at his own risk of personal injury from every cause whatever, and the said railroad company shall not be required to stop or start its trains or caboose cars from depots or platforms, or to furnish lights for the accommodations or safety of such person." Plaintiff testified further that there were from twenty to twenty-three or twenty-four cars in the train. Plaintiff was asked if he did not know prior to the time of this accident that it was more dangerous to be moving about when the train was in motion than to sit down, and

195 Sup.—8

he answered, "Of course it would be more dangerous." Asked if he did not know that on account of the danger to which passengers are exposed they were expected to remain seated while the caboose was in motion, he answered, "I supposed so." He testified further that the grade of the defendant's railroad track is up-grade from the west towards LaMonte and east to the station. In regard to the turning over of the water tank, he was asked the extent of the water in the caboose, and he answered, "That is hard to do, it was thrown so hard, it was scattered over quite a space of ground; I do not know how much water was in the keg, or anything about that."

The testimony on behalf of the plaintiff tended to show that the car which was being loaded with hogs at LaMonte was four or five cars east of the caboose, and that the caboose stopped west of the depot, and a part of the train was then east of the depot; these cars averaged from thirty to thirty-six feet in length; that the train was stopped at LaMonte to take in a carload of hogs at that point. In regard to the stopping of the train, Mr. J. D. Hanna testified that he had had many years experience in buying and shipping stock, as well as riding on freight trains, and testified that he was at LaMonte when the freight train on which plaintiff was riding arrived, and was loading a car of hogs to go on the same train. He testified that "the train stopped rather sudden there at that time, I thought."

W. H. Oglesby for the plaintiff also testified: "I noticed a very sudden stop in the train that arrived at that time; it was an unusual stop for the freight train to make."

The circuit court over the objection of the defendant permitted witnesses Hanna and Oglesby to testify that after they were through loading their car of hogs, and after the train had stopped, they went to another car in said train and found the hogs therein piled up

and the foot of one of them sticking out of the car, but both Hanna and Oglesby testified that hogs pile up sometimes in the cars in which they are shipped, and they did not know what caused the hogs to pile up that day, and the reason one of the hogs had his foot out was because the door was not fastened very well on that side.

Hanna testified that after the train stopped, the plaintiff came down to where they were loading the car at LaMonte, but when he got there, he was nearly through loading the hogs. There was nothing to indicate that plaintiff was injured in any way when he came to where he was loading the hogs, and he spoke to him, but he did not notice anything the matter with him. Oglesby also testified that plaintiff came up where they were loading the hogs and he spoke to him, but did not notice anything the matter with him, nor anything to indicate that he had sustained an injury, and that plaintiff made no complaint that he had been injured.

After the carload of hogs at LaMonte were put in the train, the plaintiff continued his journey to St. Louis, on that same train. At Sedalia, he got into another caboose. He testified that he stayed with the hogs and remained in St. Louis around the stockyards from Monday until Thursday night. He was not examined by any doctor while in St. Louis, and did not take any medicine for his injuries. It was some two or three weeks after his return home before he said anything to a doctor about it, probably a month. Dr. Rains was his family physician. Dr. Rains examined him something like a month or six weeks after the accident happened. He had been his family physician before that and afterwards. He had him subpoenaed as a witness in this case, and the doctor was in attendance upon the trial, but was not introduced as a witness by the plaintiff.

Dr. Shy testified that sometime in the summer of

1900, about August or perhaps September, he was em
·ployed by the plaintiff to make an examination; that
he made an inspection, a digital examination, feeling
the neck and looking at it with his eyes, and had examined him twice since, and he found a slight depression between the middle part of the ear and the
center of the neck and a little fullness of the muscles
on that side of the neck just to the right of the center.
At the examination a year before the trial, he found
that this muscle seemed to be smaller than the other
one. He examined the shoulder and arms and saw nothing out of the way. He testified that from his examination he thought some of the nerves were affected, but all
of them were not, and in his opinion, the injury might
have been produced by a fall or a lick at this place,
a blow or a violent jerk. On cross-examination he stated
that he could not name any medical authority on surgery that gave any account of a case where a man's
muscle was injured by jerking, that ordinarily this
kind of an injury would be occasioned by a strain, and
that rheumatism might have this effect, and there is
another disease called muscular atrophy that could produce these conditions.

Dr. Schofield also testified on behalf of plaintiff
that aside from his complaints there was very little
open to observation from which he could say plaintiff
was suffering from the injury; that he had never read
in any medical work of an accident where this muscle
had been injured by a jerk; that he discovered no indications of a blow in his examination of the plaintiff;
so far as the pain was concerned, he had to depend entirely upon the patient, and that the conditions which
are found could have been produced by rheumatism
or some other disease of the muscle.

Other facts may be noted in the discussion of the
propositions argued by the respective counsel.

I.   The relative duties and obligations which arise
when a railroad company receives passengers for hire

on its freight trains between the passenger and the
company, has been so often and so recently stated by
the appellate courts of this State, that we deem it nec-
essary only to restate the conclusion announced in the
various cases.

In Wait v. Railroad, 165 Mo. 612, it is said: "It
seems now to be well-settled law here, as elsewhere, that
where a railroad company carries passengers for hire
on its freight trains, 'it must exercise the same degree
of care as is required in the operation of its regular
passenger trains, the difference only being that the pas-
senger submits himself to the inconvenience and danger
necessarily attending that mode of conveyance.'"
[Vide cases cited, by BRACE, P. J., in support of this
proposition, 165 Mo. l. c. 621.] In that case this court
adopted the law as announced in Railroad v. Arnol,
144 Ill. 261, as follows:    " 'Persons taking passage
upon freight trains, or in a caboose or car attached
to a freight train, cannot expect, or require the con-
veniences or all of the safeguards against danger that
they may demand upon trains devoted to passenger
service, and are accordingly held to have accepted the
accommodation provided by the company, subject to all
the ordinary inconveniences, delays and hazards inci-
dent to such trains, when made up and equipped in
the ordinary manner of making up and equipping such
trains, and managed with proper care and skill.  .  .  .
But if a railway company consents to carry passengers
for hire by such trains, the general rule of its respon-
sibility for their safe carriage is not otherwise relaxed.
From the composition of such a train and the appliances
necessarily used in its efficient operation, there cannot,
in the nature of things, be the same immunity from
peril in traveling by freight trains, as there is by pas-
senger trains, but the same degree of care can be ex-
ercised in the operation of each.  The result in respect
to the safety of the passenger may be wholly different,
because of the inherent hazards incident to the opera-

tion of one train and not to the other, and it is this hazard the passenger assumes in taking a freight train, and not hazard and peril arising from negligence or want of proper care of those in charge of it.' So far as there were dangers naturally incident to the running of freight cars and a passenger car in the same train, the parties must be presumed to have contracted in reference to them, and the plaintiff to have assumed them.'' Applying the foregoing rules in the Wait case, this court said: ''There is no conflict in the evidence. There is no evidence tending to show any defects in defendant's track, train or any of its appliances. No evidence tending to show any want of skill or care on the part of its employees in the management of the train from the time plaintiff got on it until the accident happened, or that the train was stopped at an improper place or in an improper manner, or that the shock which caused his fall was not a natural and ordinary incident of the stopping of such a train in a proper manner by the proper application of the proper means for that purpose. In other words, there were no facts proved from which an inference of negligence on the part of the defendant could be legitimately drawn. On the other hand, it clearly appears from the plaintiff's own evidence that his injury was the result of his own mistake. He left his seat, stepped into the aisle, and commenced pulling off his overcoat, because, as he said, he thought the train was pulling out 'for good.' In fact it was pulling up to the station 'to stop.' Under this mistake, he placed himself in such a position as not to be able to resist the force of the stop, which was naturally incident to the stop, fell and was injured. But for it he would have remained in his seat and in all human probability would have remained uninjured as did the others in the car. For the consequence of his mistake the defendant cannot be held liable.''

In this case the testimony of the plaintiff himself

establishes that he had taken passage on a freight train consisting of some twenty-three or twenty-four cars, and had taken his seat in the caboose; he knew that the train on which he was traveling would stop at the next station, LaMonte, to take on another carload of stock at that place. He had been so advised by one of the Messrs. Hanna at Knob Noster before he left that station. According to his own testimony, as the train approached the station at LaMonte, and while it was yet moving, he voluntarily got up and started to walk to the rear of the caboose, and had taken two or three steps when a jerk, or "jump" as he described it, occurred, and he received a shock of which he now complains. None of the train crew announced the arrival of the train at LaMonte, and no one said anything to him to cause him to attempt to leave the train before it came to a stop. With knowledge of the danger in moving about in a freight train while the same was in motion, and even without this actual knowledge, in face of the presumption within the common knowledge of all who have traveled upon freight trains, that there is more or less violent jolting and jerking incident to the movement of long and heavy freight trains, he left his seat and a place of safety while the train was yet moving and at a time when the stopping of the train at LaMonte would naturally cause a jerk, as the slack of the train was being taken up, when the stop was made. In this case, as in the Wait case, there was not the slightest evidence of any defect in the defendant's track, train or any of its appliances. There was no evidence tending to show any want of skill or care on the part of the employees in the management of the train, or that the train was stopped at an improper place or in an improper manner. All that we have is that the train did stop, and thereby a jerk ensued which caused the plaintiff to lose his balance as he was attempting to walk to the rear of the caboose. No witness testified that the train made more than one stop, nor did any

of them attempt to say that while moving slowly it suddenly started faster. Hanna and Oglesby simply testified that the train stopped. One of them said "rather sudden, he thought;" the other, "that it was an unusual stop for a freight train to make." What there was unusual about the stop was not disclosed. The train was expected to stop at that station; it was the duty of those in charge of it to stop it there in order to take on another load of stock. It was not severe enough to knock the plaintiff down, although he was walking with nothing to hold to. He says he did not sit down until after the jar, and that he could not say that he struck anything, or was thrown down or off of his feet. It is not charged nor is there any evidence that the engineer was incompetent or that he did not manage or control his train in making the stop at La-Monte in the usual and ordinary manner in which such trains upon an up-grade are stopped. There is no evidence to indicate that any portion of the train was damaged, or any of the stock thereon injured by reason of the said stop. In addition to all this, the evidence of the plaintiff is that the train was moving very slowly, so slow indeed that a child could have gotten off in safety were it not jarred. And the inevitable inference must be that as only one stop is shown to have been made by all the witnesses, the jar or jerk of which plaintiff complains must have been the natural result of the taking up of the slack when the train stopped. This, it is plain, could have happened without any fault of the engineer, and as a natural result of stopping an engine as the moving cars would run forward until stopped by the locomotive, and as it was down-grade toward the caboose, in the rebound, the cars would by gravity run down the grade west towards the caboose until all the slack had been taken up and as the caboose would likewise have been running down the same grade, it would stop suddenly when all the slack had been taken up on account of the engine having

stopped. In the recent case of Portuchek v. Railroad, 101 Mo. App. l. c. 54, Judge REYBURN, speaking for the St. Louis Court of Appeals, said: "It is not to be expected that there would be the same exactness in drawing up to a station by the freight train as by a train devoted to passenger service, and precisely the same degree of care exercised in the operation of both may produce different results respecting the safety of the passengers, from the dangers inseparably connected with the conduct of one train and not with the other, and this the public presumably understands, and conducts itself accordingly, and such inherent hazards the passenger is held to assume in taking the freight train. [Wait v. Railroad, 165 Mo. 612; Railroad v. Arnol, 144 Ill. 261; Olds v. Railroad, 172 Mass. 73; Erwin v. Railroad, 94 Mo. App. 289.]"

In the last case it is aptly observed that it is a matter of common knowledge that jolting and jarring are incident to the operation of freight trains, and therefore negligence cannot be inferred from the mere fact that an injury was suffered from a jar occasioned by the stopping of such a train. In that case the plaintiff and her companions described the accident as being produced by a "very hard jolt," and "a backward jolt," "very hard or rather a hard jar, or rather a severe jolt," and it was ruled upon that evidence that the plaintiff was not entitled to recover. And in Erwin v. Railroad, 94 Mo. App. l. c. 297, Judge BLAND, speaking for the same court, said: "When the fact that there is more or less jerking and jolting incident to the operation of a freight train—a matter of common knowledge—is taken into view, negligence cannot be inferred from the mere fact that the plaintiff was injured by a jar occasioned by the stopping of the train. [Carvin v. St. Louis, 151 Mo. 334; Wait v. Railroad, 165 Mo. 612.] The rule of *res ipsa loquitur* can only be applied where there is something which, if unexplained, tends to show

that some negligence or omission of duty was the prox-
imate cause of the injury. The plaintiff, by his own
evidence, shows that he placed himself in a position in
the car where it was probable that he would be bumped
against the frame work of the seat or thrown off the
seat, or both, by the usual jolting incident to the stop-
ping and starting of a long and heavy freight train."
In Saxton v. Railroad, 98 Mo. App. 1. c. 503, SMITH,
P. J., for the Kansas City Court of Appeals, in discuss-
ing the question now before us, said: "There was no
evidence adduced which tended to prove that the jerk
was unusual, extraordinary or unnecessary and not
usually incident to the ordinary, careful and efficient
operation of the train. It was not enough to prove that
there was a jerk in the movement of the train. One of
the plaintiff's witnesses testified that it seemed to him
that the jerk occurred when the train took up the slack,
but it does not affirmatively appear, as it should, in
order to show liability, that the jerk was an extraordin-
ary or unusual one, *attributable to a defect in the track,
an imperfection in the car or apparatus, or to a danger-
ous rate of speed, or to the unskillful handling of the
engine by the engineer, or to something of that kind.*
[Bartley v. Railroad, 148 Mo. 139; Hite v. Railroad,
130 Mo. 136, and other cases cited.]"

In Guffey v. Railroad, 53 Mo. App. 466, the
testimony of the several witnesses described the jar or
jars which occurred in practically the same language
as that used by the plaintiff in the case at bar, except
that neither Hanna nor Oglesby described the stop to
be as sudden or severe as that described by the wit-
nesses in the Guffey case, or in the Portuchek case, and
speaking of this Judge SMITH says: "We do not
think these expressions of the witnesses are of any
value whatever, or stated so much as a scintilla of evi-
dence." All of these expressions amount to mere con-
clusions or opinions of the witnesses. Neither the
plaintiff nor Hanna nor Oglesby undertook to describe

what the engineer was doing, how he did it, or what caused the jerk of which plaintiff complains.

If the plaintiff can recover on the facts elicited on the trial of this case, it must be upon the one proposition that the jar or jerk caused by the train stopping was *ipso facto* negligence. We know of no case that would justify us in so holding. The jar was the natural result of the stopping of a long train of freight cars, and the giving out of the slack. When it is considered that it is a matter of common knowledge that in the movement of trains there is more or less jolting and jerking incident to the starting and the stopping of the train, and that, so far, human skill and ingenuity has not been able to prevent this entirely, it cannot be said as a matter of law that negligence can be predicated upon the mere fact that the jolt or jerk results from the stopping of a long freight train. It is well settled that negligence cannot be presumed when nothing is done out of the usual course of business, unless the course is improper. There is nothing in this record to indicate that there was any act of omission or commission not usually incident to the constant moving of heavy freight trains under the control and management of skillful and careful employees. We are not unmindful of the contention of the plaintiff that the defendant jerked or knocked or bumped the train with unusual, unnecessary and extraordinary force against the caboose, but we are clearly of the opinion that in the light of the uniform expressions of this court and of the several appellate courts, the evidence in this case was wholly insufficient to establish any such unusual and extraordinary jarring and jerking.

In our opinion the basic fact upon which a recovery must rest in this case, to-wit, the negligence of the defendant, was not established either by the positive testimony of the witnesses or by any presumption of negligence arising out of the facts developed, and it results that the plaintiff was not entitled to recover,

and the judgment of the circuit court must be and is reversed and judgment rendered here for the defendant. *Burgess, P. J.,* and *Fox, J.,* concur.