MAY MARTIN, Administratrix of Estate of WILLIAM H. MARTIN, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.

In Banc, February 11, 1924.

1. **NEGLIGENCE: Interstate Commerce: Burden: Amount of Damages.** The burden is on plaintiff, who sues under the Federal Employers' Liability Act for damages to her from the negligent killing of her husband, who was the fireman of a switch engine employed in making up freight trains in the yards of an interstate railroad, to prove that he was, at the time of his injury, actually engaged in handling cars loaded with interstate freight; it is not enough

to show that he might have been so engaged; and where the evidence tends to show only that interstate cars and intra-state cars were indiscriminately hauled in the yard, but does not show that any of the cars which the switch engine was handling were interstate cars at the time they collided with other cars in the yard and her husband was injured, she does not successfully carry the burden, and the court errs in submitting her case on the theory that he was engaged in interstate commerce, and hence the instruction on the measure of damages should limit her recovery to $10,000.

2. ———: **Usual Occurrence: Demurrer to Evidence.** Deceased was fireman of a switch engine used in making up freight trains in a railroad yard, and the petition alleges, as the cause of his injury, that while he was engaged in throwing coal on the fire, the engine and cars attached thereto collided violently with other cars standing on a track, and he was thrown by such collision against the iron can rack in the cab, and that the members of the switching crew negligently failed to signal each other or the engineer of the presence of other cars on the track and that the engineer, without receiving any signal and without keeping a lookout, negligently ran his engine violently against the standing cars. The evidence shows that the engine was moving about three miles an hour, down grade, with the steam shut off; that it was usual to make couplings while the engine was going at that rate, without slacking the speed or stopping the cars or engine; that the coupling was made in the ordinary way; that it was usual for cars to be standing at the place where they were when the coupling was made; that it was not usual to signal firemen when cars were coupled, and they knew nothing of such signals or of the time when couplings were made, from which it follows that it was incident to the fireman's service for him to receive without notice a jar or jerk produced by the ordinary coupling of cars; and that when the cars came together he was in the act of throwing a shovelful of coal into the firebox, lost his balance, and stumbled or fell against the can rack, striking it with his shoulder, and the blow he received was so slight that he said he was not hurt, and worked through the night without referring to it. *Held*, that, as there was no unusual or extraordinary jerk, no negligence was shown, and defendant's demurrer to the evidence should have been sustained.

3. ———: **Jerk or Jar of Cars: Rule of Liability.** In order for the fireman of a switch engine employed in making up freight trains in a railroad yard, to recover for personal injuries received from a jar or jerk when the engine and cars attached thereto collide with stationary cars in an effort at coupling them together, the

jerk or movement of the cars or engine must be violent, sudden and unusual, and not the usual and ordinary jerk or movement. There being no actual negligence shown on the part of the engineer or switchmen, a presumption of defective appliances or negligent operation arises from an unusual and extraordinary jerk or movement, but not otherwise.

Appeal from Christian Circuit Court.—*Hon. Fred Stewart,* Judge.

REVERSED.

*W. F. Evans, John H. Lucas, Wm. C. Lucas, G. Purd Hayes* and *W. P. Sullivan* for appellant.

(1) The court erred in refusing to give the peremptory charge asked by appellant at the conclusion of all the evidence. There is no right of recovery alleged and none under the evidence. (a) Not engaged in interstate commerce. Shanks v. Railway Co., 60 L. Ed. 436; Behrin v. Ill. Cent. Ry. Co., 233 U. S. 473, 58 L. Ed. 1055; Ukonis v. Railway Co., 59 L. Ed. 1399; Ill. Cen. Railroad Co. v. Peery, 242 U. S. 292, 61 L. Ed. 309; Erie Railroad Co. v. Welsh, 242 U. S. 303; Minneapolis Railroad v. Winters, 242 U. S. 353; Lehigh Valley Railroad v. Barlow, 242 U. S. 183, 61 L. Ed. 1070; Michigan Central Railroad v. Vreeland, 227 U. S. 59. (b) The business was carried on in the usual manner. Union Pac. Railroad v. McDonald, 152 U. S. 262; McMahan v. Pac. Express Co., 132 Mo. 641; Stanley v. Union Depot Ry. Co., 114 Mo. 619; Karle v. Railroad, 55 Mo. 476; Texas Pac. Ry. v. Barnett, 166 U. S. 617. (c) Deceased assumed the risk. Erie Railroad v. Headway, 266 Fed. 342; American Can Co. v. Allan, 264 Fed. 547; 26 Cyc. 1196; 2 Thompson on Neg. 1008; Thomas v. Railroad, 109 Mo. 187; Mathis v. Stockyards Co., 185 Mo. 434; Porter v. Railroad, 71 Mo. 77; Williams v. Frisco, 119

Mo. 316; Price v. Railroad, 77 Mo. 508; Gleason v. Mfg. Co., 94 Mo. 206; Huletts v. Railroad, 67 Mo. 239; Patrun v. Frisco, 259 Mo. 124; Morris v. Pryor, 272 Mo. 362. (d) The court should have directed a verdict. Southern Ry. Co. v. Gray, 241 U. S. 333; Empire State Cattle Co. v. Ry. Co., 210 U. S. 1, 52 L. Ed. 931; Flack v. Ry. Co., 285 Mo. 48; Goransson v. Mfg. Co., 186 Mo. 309; Trigg v. Ozark Land & Lumber Co., 187 Mo. 227; State Utility Board v. Sturgis, 281 Mo. 508.

*Moore, Barrett & Moore, Hamlin & Hamlin* and *C. W. Hamlin* for respondent.

(1)  If at the time deceased received an injury he was engaged in firing an engine belonging to the defendant, which engine was being used to handle, indiscriminately, both interstate and intrastate freight, then the deceased will be regarded as engaged in interstate traffic, and the defendant will be regarded as engaged in transporting interstate commerce.  Persons and machinery engaged in and used for the purpose of handling indiscriminately both interstate and intrastate traffic will be regarded as engaged in the transportation of interstate commerce.  Atlantic Coast Line Co. v. Reaves, 208 Fed. 141; No. Pac. Railroad Co. v. Maerkl, 198 Fed. 1; Colasurdo v. Central Railroad, 180 Fed. 832; Zikos v. Oregon Ry. & Nav. Co., 179 Fed. 893; Horton v. Ore. & Wash. Ry. & Nav. Co., 130 Pac. 897; Oberlin v. Ore. & Wash. Ry. & Nav. Co., 142 Pac. 554; Montgomery v. Southern Pac. Ry. Co., 131 Pac. 507; Burtch v. Wabash Ry. Co., 236 S. W. 338; Soeder v. Ry. Co., 100 Mo. 681. (2)  The employee assumes such risk as in reasonably incident to his employment, but he never assumes the risk of his employer's negligence.  Hough v. Ry. Co., 100 U. S. 213, 25 L. Ed. 612; Wabash Railroad Co. v. McDaniel, 107 U. S. 455, 27 L. Ed. 605; Choctaw Oklahoma Railroad Co. v. McDade, 191 U. S. 64, 48 L. Ed.

96; Jewell v. Bolt & Nut Co., 231 Mo. 176, 194; Smith v. Fordyce, 190 Mo. 28; Curtis v. McNair, 173 Mo. 270; Phippin v. Ry. Co., 196 Mo. 347; Dagan v. Chase, 197 Mo. 267; George v. Railway, 225 Mo. 364. (3) If the defendant's negligence contributed to the accident, that is to say, if its action had a share in bringing about disaster, the defendant would be liable. Sandidge v. Railway Co., 193 Fed. 875, par. 9. (4) The question of whether the engine and cars were moving rapidly enough to cause an injury when jammed into standing cars is a question for the jury. In other words, where a party is ejected from a train that is moving very slowly, the question of whether the defendant was guilty of negligence in so doing is properly left to the jury to decide. Meyer v. Mo. Pac. Ry. Co., 40 Mo. 154.

SMALL, C.—I. Suit by widow for death of her husband under Federal Employers' Liability Act. Plaintiff recovered judgment for $17,000, from which defendant appealed.

The petition alleged that, on September 15, 1920, the defendant was engaged in operating a railroad carrying freight and passengers to and from the States of Missouri, Oklahoma, Kansas, Texas and Tennessee. That her husband was the fireman of a switch engine and member of a switch crew in the yards of defendant at Springfield, Missouri. That said engine and crew were used by defendant in making up trains at Springfield going to points in Tennessee, Oklahoma, Kansas and Texas, and in distributing cars brought into such yards from those states. That on the night of September 15, 1920, while working as such fireman on a switch-engine in said yards while handling interstate traffic, as he was engaged in throwing coal on the fire in said engine, the said engine and cars violently collided with other cars standing on the track, and he was thrown by such collision against the iron can rack on the boiler, or against the cab, or bolt in the cab, plaintiff does not know which,

but believes it was one or the other, and was injured as follows: "Was bruised near the junction of the lower lumbar region and sacrum by reason of which his spinal cord was injured sufficient to cause loss of consciousness and temporary insanity," and finally caused his death on November 20, 1920. The negligence charged is that the other members of the switching crew, the night being dark, negligently failed to be at such places on said train, where it ran on a curve, so as to enable them to communicate with each other and to signal each other and the engineer in charge of such engine, of the presence of other cars or obstructions on the track, in time to avoid colliding therewith, and the engineer knowing this fact negligently proceeded with said cars and ran said engine and said cars violently against said other cars standing on the track. That a switchman could have been placed on the cars or on the ground where he could have notified the engineer of such cars on the track in time to have prevented such collision. That the engineer also negligently failed to keep a sharp lookout for such obstructions on the track and for signals from the switchmen. The prayer was for $50,000 damages. The answer was a general denial, assumption of risk, and contributory negligence on the part of the deceased. The reply put the affirmative defenses of the answer in issue.

*Plaintiff's Evidence*: Garner, the engineer, testified, in substance: That on the night of September 15, 1920, he was engineer and the decedent was fireman on a switch engine of defendant at its yards in Springfield, Missouri. There were three other members of the switching crew, a foreman and two switchmen as helpers. That night, Wolf was the foreman, Kirkman was a helper and Potter was the other man, he thought, though not certain. The foreman gave directions for the movement of the engine. The engineer stays on the right hand side of the engine—the fireman on the left. "We were switching freight from and to the freight house from the yard up by the round house, to the freight house."

"Q. Where would those cars come from? A. The engine known as the transfer engine brings the cars from the north yards to the south yards. The transfer engine brings them over. The switch engine switches out what cars belong to the freight house and puts them there. That is what we were doing.

"Q. Suppose the cars at the freight house were loaded for Memphis and Kansas City and Dallas, etc., what do you do with those? A. All those cars they pull out on those tracks from the freight house and switch them out on the hill toward the round house. The cars that go different directions throw all of these on a track together, then this transfer engine picks them up and takes them to the north yards. Some go one way and some another. That night about 10:30 we were pushing ten cars. The switchmen were on the head car. There was a little slight curve on the track near the Jordan, where we came into some cars. About the time we collided with them, one of the switchmen came out and gave me a signal to stop. About the time we hit, he came out where I could see him. I had already stopped. I stopped the engine, I set the brake. I was sitting in the cab window when we hit the cars, looking the way I was going. When the impact came I set the brake on the engine. Martin was putting in coal when we struck those cars. I saw him after the cars struck, he was making an effort to throw a shovel of coal in the fire box and he 'kinda' lost his balance and ran against the can rack with his shoulder about there, I guess (indicating).

"Q. He didn't fall down, or anything like that? You were paying attention to your work, not his? Watching your signals? You didn't know what had happened; the first you saw of him was when you saw him against the can rack? A. Well, yes, I asked him if he was hurt and he said, 'No'. He worked on until morning and quit about 4:30."

Cross-examination: "Martin had been in that yard service over a year. Was well acquainted with the

yards.    Went over that place several times a night.
(Witness identifies photograph and blue print showing
details of boiler front and cab).    Went to work at 8:30
P. M.; quit at 4:30 P. M.    I didn't know he was hurt on
that occasion.    At the time Martin fell against a por-
tion of the car (engine) these cars were not being oper-
ated in a different manner from the manner in which
they were ordinarily or usually operated.    I judge we
were going about three miles per hour—just drifting—
the engine was shut off.    We met a string of cars ahead
of us and coupled on to them.    Nothing unusual to meet
a string of cars in the yard at that point in switching
around.    Three miles an hour is pretty slow—about like
a man would walk.    He received no injury that I know
of.    I was sitting on the cab window.    The jar of the
coupling back was not severe enough to move me in
my seat at all.

"Q.    Was it severe enough for you to notice it
at all?    A.    Well, no, I don't know it was.    I would feel
the shock there more than at any other place on the lo-
comotive.    The fireman never gets any signals at all
under ordinary circumstances.    Sometimes, the switch-
men have to work on the fireman's side and have him
pass the signals.    That was not the case this time.    The
general rule is, the coupling of cars is made without no-
tice to the fireman at all.    I knew there were cars down
there some place.    It was customary in switching cars
out that cars were ahead and were to be moved from
one position to another.    That was this case.    Always
find cars down in this sag after switching out a cut of
cars from the house.    It is not unusual to move a car
by coming in contact with it.    Let it roll out onto some
other track.    Didn't hit these cars so very hard, I don't
think—about like making a coupling.    I have hit freight
cars lots of times harder than those hit.    Some of those
couplings you have got to hit awful hard before the pin
will drop.    I have had them to have me come against
them different times to make a coupling.    I don't think

302 Mo. Sup.—33.

Martin's head hit anything. His back did not hit anything. Nothing occurred except his shoulder hitting the pan. I made no report about the accident to the company, because there wasn't any one injured, there was no damage done to the company's property. There was nothing unusual to make a report about it.''

Re-direct-examination: ''I was working under the 'go ahead' signal when we made the coupling. The nearest switchman to me was about the second or third car from the end of the cars.''

Pat Kelly testified as an expert: That he had operated the engine on which deceased was hurt, and that the deceased while in the act of shoveling coal, if the engine and cars collided with other cars, might be thrown so that his back would strike the can rack. Defendant duly objected to this evidence, as usurping the province of the jury.

A. E. Jennings testified for plaintiff: He was a locomotive fireman and had run engine 965 and was familiar with its makeup. He was asked substantially the same hypothetical question as the witness Kelly, to which defendant made the same objection, which the court overruled and defendant excepted. But he answered that he would probably hit his shoulder or his side on the can rack, and that if the rate of speed was only three miles an hour there was not anything on the cab he could have been thrown against except to strike his shoulder or his side. The impact of eight or ten cars going three miles an hour in coupling into one or more cars ahead, if the engineer should immediately apply his brakes would be not much more than to throw a fireman off his balance.

W. P. Gustun testified: He was yard master at Springfield. That all freight from all points in and out of Missouri that was shipped to Springfield over the Frisco passed through the yards at Springfield. Each switch engine is used in the yard for the purpose of handling any cars it may be necessary to handle, regardless of where they are from or their destination.

*Defendant's Evidence*: Richards testified: That he was brakeman on the switching crew on the 15th of September, 1920, with the deceased Martin, but didn't know he was injured, or that anybody was injured at that time. First he knew of any claim of injury was after Christmas in the winter of 1921.

William Taylor testified: That he was also a member of the switching crew with the deceased on the night of September 15, 1920. That he didn't hear of anyone getting hurt at that time, and never knew that it was claimed that Martin was hurt until just a few days before he died. He didn't know anything about how the train was operated that night. In coming down with an engine and one or more cars to pick up other cars, one switchman would be on the foot-board or the hind car, one in the middle and one on the front end. When you come to a curve the switchman back of the foreman would drop off to the ground so he could catch a signal and give it to the engineer; supposed to stay within view of the engineer all of the time.

Charles Kirkman testified: He was one of the switching crew with the deceased Martin in September, 1920, but he knew of no accident to Mr. Martin, never heard of any claim of that kind until about the time of Martin's death. In making up the trains when going at the rate of about three miles an hour you couple on to cars standing, without stopping. That is just about right to make a coupling. That was the practice in September, 1920. The foreman would always drop off at the curve in the track; while rounding the curve he might be out of sight while dropping to the ground; after he got to the ground, he would get himself in a position to receive and transmit a signal. When we make these couplings one of the switchmen stays in a position where he can communicate with the engineer at all times.

L. A. Wolf testified for defendant: That he was foreman of the switch gang in September, 1920, when Martin was fireman. Knew nothing of Martin's injury. A fire-

man and engineer always know there are cars backed down on the track. It is an every night occurrence. We let them run down the track, and when we get through we take them on. We go down to them and couple them up as we go down to them. If there are three or four separated a few feet apart, we keep moving ahead until we hit the last one, then give a signal to stop to see if they are all coupled together. We may have to come ahead again. The couplings are automatic. If we are going three miles an hour down there and hit a car, when we couple on to that car we keep ahead.

Cross-examination: "In making these couplings, we come right along and never stop after hitting one car, but just go on to another, if we are running at a proper rate of speed, a pretty slow rate of speed. We do lots of coupling at four miles an hour. You just keep moving along, never stop the engine. The impact of coupling at three or four miles an hour wouldn't be a hard shock."

Mr. Finkenleider testified for defendant: That he was assistant yardmaster. The couplings used at the Springfield yards were all automatic. As the cars come along, they make the couplings themselves. The old pin coupling required a man at every car. The automatic coupling has overcome all that. With the old pin coupling it was necessary to stop. With the automatic coupling it is not necessary to stop before you come into a car that has a coupling open unless something is wrong; then a switchman must go in and make a coupling. Then you go on. With an engine of eight or ten cars going three or four miles an hour down the track in these yards near the Jordan, it wouldn't be necessary to stop at all with the automatic coupling.

Cross-examination: The cars that were being switched the night of the injury were not going to points outside of the State. They stayed in Springfield. The freight in those cars would stay in Springfield. We have thirty cars every day to stay in Springfield.

As to deceased's injuries: Plaintiff, May Martin, testified that on the morning of the 16th of September,

1920, her husband came home about five o'clock, and when he complained of an injury she examined him and found a swelled place about as big as a goose egg on the small of his back. That he was unable to work, but worked the next two nights, but not after that. That he had spells from that time on every two or three days lasting about twenty-four hours in which he was out of his head. He could not understand what was said to him, nor recognize those about him. That he remained at home some time, and was then sent to the 'Frisco Hospital at Springfield in October, 1920, and from there he was sent to the Frisco Hospital at St. Louis the latter part of October. That he returned home and was put under treatment by Dr. Coy on November 5, 1920, and died November 20th, the same year. Dr. Coy testified, for plaintiff, that he saw a swelled place about three inches in diameter and a half inch thick in the small of his back. It was not bruised nor lacerated, and a small hole was in it, made by some instrument, and it had gauze and adhesive plaster over it. In his judgment, he had and died of meningitis which might have been caused by a traumatic injury or by a germ.

Dr. Tucker also testified, for plaintiff, that meningitis might be caused by a traumatic injury to the spine or by different causes.

The physicians at the defendant's hospital who examined the deceased, two at the defendant's Springfield hospital and four at defendant's St. Louis hospital, all testified, for defendant, that they examined plaintiff's husband carefully, and he had no injury or swelling of any kind on his back, or head, or body, but that he was mentally deranged, could not understand nor answer questions, and that his mental derangement was caused by some pressure on his brain on the inside of his skull. That he exhibited no evidence of meningitis. That they did not know what caused the pressure on his brain, which could not be known without an autopsy, which was not held. That he left the hospital at St. Louis on November 3rd. At St. Louis at the hospital the physicians also inserted

a needle into the small of his back and extracted some of the fluid of the spinal cord, which they examined and found to be in a perfectly healthy and normal condition. This operation left a small hole in the skin and flesh over which they put some gauze and adhesive plaster. They testified that if this small wound was not properly treated, after he got home, it might become infected and swell up and look like a boil.

The father and mother and brother of the deceased testified for the defendant: That he and his wife visited them at their home in Aurora in October, 1920. That the only thing he complained of was a severe pain in his head. He never said anything about being injured while at work for the railroad company, except that in the summer before he was overheated in making one of his runs, of which fact he told a number of other witnesses, including some of the witnesses for the plaintiff. He also had typhoid fever the summer before his injury.

The defendant offered demurrers to the evidence at the close of plaintiff's testimony, and also at the close of all the testimony, which the court refused. The court submitted the case on instructions for the plaintiff, on the theory, that at the time of the injury complained of the deceased was engaged in moving interstate freight cars in said yards, and that his fellow switch-men were negligent in placing themselves in such a position that the engineer could not see them, and they could not see the engineer or give him a signal upon the discovery of the cars upon the track, in sufficient time for the engineer to have prevented the collision, which injured the deceased, if such collision was of sufficient force and violence to throw the deceased against any part of the engine or boiler as to cause the injury complained of. The court also instructed the jury that plaintiff's recovery could not exceed $50,000, it was not limited to $10,000.

I. We think the court erred in submitting this case on the theory that the deceased was engaged in interstate

commerce at the time of his injury. It is true
that the plaintiff's evidence tended to show
that interstate cars and intrastate cars were
indiscriminately hauled by the switch engines of the defendant company in its yards at Springfield. But the evidence does not show that any of the cars, which the engine on which plaintiff's husband was when injured was handling, were interstate cars at the time of his injury.

*Interstate Commerce.*

We have recently had occasion to pass on this question. In Myers v. Railroad, 246 S. W. (Mo.) at page 263, we said: "The burden of proving that plaintiff at the very time of his injury was engaged in interstate commerce was upon the defendants." In that case, the defendants alleged, as a defense, that plaintiff was engaged in interstate commerce when injured. On page 264 we said: "In Illinois Central Railroad v. Behrens, 233 U. S. 473, 34 Sup. Ct. 646, 58 L. Ed. 1051, Ann. Cas. 1914C, 163, and Chicago, Burlington & Quincy Railroad v. Harrington, 241 U. S. 177, 36 Sup. Ct. 517, 518, 60 L. Ed. 941, it was held that when an employee is engaged in work pertaining to both classes of commerce, the railroad company is not liable under the Federal statute for his injury unless the particular service in which he was employed at the time of the injury was a part of interstate commerce, even though upon completion of such work the employee was to engage in work which was a part of interstate commerce."

In the case of the Illinois Central Railroad v. Behrens, supra, the precise question before us here was before the court. In that case the injured party was a fireman on a switch engine in the railroad yards of defendant in the city of New Orleans. The court said (233 U. S. 476) : "At times, the freight in such cars was destined from within to without the State or *vice versa;* at other times was moving only between points within the State, and at still other times was of both classes. . . . In short, the crew handled interstate and intrastate traffic indiscriminately, frequently moving both at once, and at

times turning directly from one to the other. At the time of the collision the crew was moving several cars loaded with freight, which was wholly intrastate, and upon completing that movement was to have gathered up and taken to other points several other cars as a step or link in their transportation to various destinations within and without the State." At the time of the injury, all the cars being moved by the firemen, were intrastate cars, and the court said, page 478: "That was not a service in interstate commerce, and so the injury and resulting death were not within the statute. That he was expected, upon the completion of that task, to engage in another which would have been a part of interstate commerce, is immaterial under the statute, for by its terms the true test is the nature of the work being done at the time of the injury."

In the case we have in hand, the plaintiff's evidence simply tends to show that the deceased might have been engaged in interstate commerce, and not that he was actually so engaged at the time of his injury. It was not shown, that he, at the time of his injury, was engaged in handling any car loaded with interstate freight. The burden was on the plaintiff to show this fact; otherwise, no cause of action is made out under the Federal Employer's Liability Act. The evidence of the defendant did not aid the plaintiff's case in this respect, but tended to prove that all the cars being handled at the time of plaintiff's injury were local cars, loaded with freight for or to be stopped at Springfield. Consequently, plaintiff's instruction on the measure of damages, should have been limited, as under the state statute, to $10,000.

II. We are also of opinion that defendant's demurrer to the evidence should have been sustained, because

Case for Jury.

there was no substantial evidence of negligence on the part of the defendant which caused the injury to the plaintiff's husband. In this case, all the evidence, both that of the plaintiff and defendant, tends to show that there was no unusually violent or ex-

traordinary jerk at the time of the deceased's injury. That the coupling was made in the ordinary way while the train was not going faster than usual, about three miles an hour, with the steam shut off. That it was the usual thing to find cars at the place where they were struck when the deceased was injured, which he knew. That in coupling cars, frequently more violent jerks were caused. That it was not customary to signal the fireman when cars were coupled, and that he knew nothing of such signals or of the time when couplings would be made, from which it follows that it was incident to his service for him to receive the jar or jerk of making a coupling without notice. The engineer testified: That when the cars struck, the deceased "was making an effort to throw a shovel of coal in the firebox and 'kinda' lost his balance and ran up against the can rack with his shoulder." That he asked him if he was hurt and he said no, and he worked until morning without further reference to the incident. Under the testimony, we hold, that there was no substantial evidence of any extraordinary or unusual jerk, and that, therefore, there was no evidence of negligence in the operation of the cars when the deceased was injured.

In a recent case, where a passenger was injured by the jerking of the cars on a passenger train, Elliott v. Chicago, Milwaukee & St. Paul Ry. Co., 236 S. W. (Mo.) 20, we said (per RAGLAND, J.) : "In this case, 'the sudden, violent and unusual movement and jerking of the train or car' is the unusual and extraordinary thing which plaintiff claims happened and caused her injury during her transportation. If there was such an occurrence, then the presumption of defective appliances or negligent operation arises; otherwise, there is no evidence whatever of negligence on the part of the defendant. The demurrer, therefore, challenges plaintiff's proof with respect to there having been a jerk, jar or movement of the cars that was unusual or extraordinary." We also said, page 21: "It will be noted there is no evidence that anything else in the car was disturbed or disarranged, or that any other person or passenger suffered or appeared to

suffer the least inconvenience thereby, or was even conscious of any jerk or jar out of the ordinary, or that the train did not immediately thereafter proceed on its way in the usual and ordinary manner." In that case, however, it was held on account of the testimony of the conductor, for defendant, on cross-examination, that a jar that was sufficient to throw a passenger down was very unusual and extraordinary, there was a case for the jury. But that was a passenger train where violent jerks, such as occur on freight trains, are unusual. In this case, the jar was so slight, according to the plaintiff's witness, the engineer, that he himself, the engineer, did not feel it or notice it, and the deceased was not thrown against the can rack or other portions of the engine, but simply was caused to lose his balance, while in the act of shoveling coal into the furnace, and ran or fell against the can rack, and the blow which the deceased received was so slight that he said he was not injured, and worked on all night without referring to it.

The leading case on this subject is Hedrick v. Railroad, 195 Mo. 104. In that case, a passenger was injured while riding in the caboose on a freight train. It was held that where there was no evidence of any negligent act on the part of the brakeman or engineer, except that the train stopped a little more suddenly than customary, the plaintiff could not recover, although he was a passenger, and the jerk was so violent that he lost his balance and struck against a door so hard as to render him unconscious for a moment or two. "It jerked me senseless and injured my neck," the plaintiff in that case testified. The cases were reviewed by GANTT, J., who delivered the opinion of the court. The court said (p. 121): "It is a matter of common knowledge that jolting and jarring are incident to the operation of freight trains, and therefore negligence cannot be inferred from the mere fact that an injury was suffered from a jar occasioned by the stopping of such a train." And the court held, in substance, that no cause of action arose, and there was no proof of negligence unless the evidence showed the jerk was unusual or extraordinary.

Also in another passenger case, Wampler v. Railroad, 269 Mo. 485, the court, per Graves, J., said: "Unless something more than the usual jerk occurred there was no negligence on the part of the defendant. In other words, if the thing that happened was not unusual in the operation of freight trains, there was no negligence. This doctrine is so fully discussed in our cases, that a citation of two or three will suffice. [Wait v. Railroad, 165 Mo. 612; Hedrick v. Railroad, 195 Mo. 104.]"

In Patrum v. Railroad, 259 Mo. 117, we said: "We need not refer to the testimony of these witnesses, except to say that they both testified that in making the coupling by which the stock car was thrust against the empty car and the deceased was caused to fall, there was nothing out of the ordinary; that this work was done just as it is ordinarily done; that there was no unusual force, and no more force than was necessary under the circumstances, and there was no difference in the handling of that engine and those cars as compared to the usual and customary manner of doing this work on freight trains ordinarily used a hundred times a day." And the court held, that the injury complained of was one ordinarily incident to the business which the deceased assumed and was not the result of defendant's negligence.

But respondent's learned counsel contend that the jerk in this case was the result of the negligence of the brakemen in failing to be and remain in such a position, that they could see the cars coupled onto and signal the engineer of their presence and of the intention to couple onto them. But even if they had been where they could have signaled him, the evidence does not show they would have signaled him to stop or slacken his speed to make the coupling, or that it was necessary to do so, because he was only going three miles an hour without steam on, down a slight grade, and it was usual to make couplings while going at that rate without slacking or stopping the cars. The signal that was given was a signal to stop given after the coupling was made, inferably to indicate the coupling had been successfully made, and that it was

not necessary to move the train ahead any further. The evidence does not warrant the inference that such signal was given to slow down before striking the standing cars and making the coupling. It was a signal to stop and not to slow down, so far as shown by the evidence. The couplings were automatic. The evidence shows it is necessary to strike cars with some force in order to make the coupling, and that no more force was used on this occasion than ordinarily.

But the presence of the switchmen at all times where they could give signals to the engineer is not determinative of plaintiff's cause of action. The gravamen of the charge in such cases—the actionable negligence—is the unusual or extraordinary character of the jolt or jerk without which there is no cause of action against defendant.

If jolts sufficient to cause a passenger on a freight train to lose his balance and be injured, as in the Hedrick Case, supra, are usual and incident to the operation of freight trains, it would seem to follow that jolts in switching cars in switch yards, which occur constantly as a part of the business, which simply cause a fireman to lose his balance and strike the can rack so lightly that he was not aware he was injured at the time, as in this case, must also be held to be usual and incident to the business, and not unusual or extraordinary.

There being no evidence of any unusual or extraordinary jerking or jolting of the cars at the time of the alleged injury to plaintiff's deceased husband, defendant was not guilty of actionable negligence, and it is unnecessary to consider other contentions urged by the appellant.

We are compelled to reverse the judgment. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion is adopted as the opinion of Court en Banc. All concur, except *James T. Blair* and *White, JJ.,* who concur in reversing the judgment, but think the cause should be remanded.

Headnotes 1, 2 and 3: Master and Servant: 1, 26 Cyc. 1415 (1926 Anno), 1442; 2, 26 Cyc. 1444; 3, 26 Cyc. 1155.