WAIT, Appellant, v. OMAHA, KANSAS CITY AND EASTERN RAILROAD COMPANY.

Division One, December 17, 1901.

1. **Railroad:** FREIGHT-TRAIN PASSENGERS. Where a railroad company carries passengers for hire on its freight trains it must exercise the same degree of care that is required in the operation of its regular passenger trains, the difference being only that the passenger on the freight train submits himself to the inconvenience and danger necessarily attending that mode of conveyance.

2. ———: ———: DEMURRER TO EVIDENCE. The plaintiff was told by the station agent that the passenger coach of the freight train, for which he had been sold a ticket, would probably not stop at the platform, as it was the custom of the train when late to attend to its freight business and then pull out without stopping, and that he had better go up the track some distance to where the passenger coach was standing and get on there. He did so, and the train started up with enough speed, as he thought, to indicate it would not stop, but was "off." He thereupon got out of his seat, and stepped into the aisle to pull off his overcoat. The train suddenly stopped and he was thrown against the seats and badly injured. There was no evidence tending to show any defect in the track, train or its appliances, or any want of skill or care on the part of the trainmen, or that the train was stopped at an improper place, or in an improper manner, or that the shock which caused plaintiff's fall was not a natural or ordinary incident of a proper stopping of the train. *Held*, that the court properly sustained a demurrer to the evidence, there being no facts proved from which an inference of negligence on the part of the railroad company could be legitimately drawn.

Appeal from Sullivan Circuit Court.—*Hon. Jno. P. Butler,* Judge.

AFFIRMED.

*Wilson & Clapp* for appellant.

(1)   The obligation of the carrier begins with the reception of the passenger.   State v. Blunt, 110 Mo. 322.   (2) If a railroad company admits a person into a caboose attached to one of its freight trains, to be transported as a passenger, it incurs the same liability for his safety as though he had taken passage on one of its regular passenger coaches; and it is its duty to so run and manage its trains and so handle its passengers that no one shall be injured by its own negligence. Railroad v. Doane, 1 L. R. A. 157; Railroad v. Selby, 47 Ind. 471; Railroad v. Dickerson, 59 Ind. 317.   (3)   A carrier of passengers is bound to employ the highest degree of care practicable under the circumstances. Railroad v. Nugent,

39 L. R. A. 161; Coughlan v. Railroad, 87 Am. Dec. 600. (4)  Plaintiff's evidence tended to show that he was a passenger on one of defendant's passenger-carrying trains, and was injured without his fault by the sudden stoppage of the train. This was sufficient to establish a prima facie case of negligence on the defendant's part.   Higgins v. Railroad, 36 Mo. 419; Hipsley v. Railroad, 88 Mo. 348; Furnish v. Railroad, 102 Mo. 438.   (5)  It is not the province of the trial court, after plaintiff has made out a prima facie case, to give an instruction to find for defendant offered at the close of all the testimony, even where defendant's proof is undisputed, unimpeached and sufficient to overcome the prima facie case. The plaintiff is entitled to have the jury determine the credibility of the testimony offered, even though he offer nothing to contradict that presented by the defendant.   Nor can the court assume, as a matter of law, that the testimony is true, satisfactory or convincing to the jury simply because no one by words contradicts what has been uttered.   Gannon v. Gas. Co., 145 Mo. 502.   (6)  To authorize the sustaining of a demurrer in an action for personal injuries on the ground of contributory negligence on the part of the plaintiff, an unavoidable inference of such negligence must arise from the plaintiff's own evidence. Cox v. Granite Co., 39 Mo. App. 424; Buesching v. Gas Co., 73 Mo. 219.   (7)  Plaintiff swore that the train did not slack up as it was going by the depot as it pulled out; that they were moving right along at a pretty good speed when the train stopped; that the train had got a little past the depot before it stopped; that it stopped suddenly; that the ticket agent had told him to go down to the tank and get on board the train there, that when the train was late it would pull right out from the tank; and probably would not stop. From this testimony the jury had a right to find that the train had passed the depot and was pulling out, that the sudden stopping of the train was a negligent act, and the defendant's rising up to take off his overcoat was not contributory

negligence on his part. The court therefore erred in taking the case from the jury. Cox v. Granite Co., supra; Buesching v. Gas Co., supra.

*J. M. Winters* and *J. G. Trimble* for respondent.

(1) There was no evidence of negligence other than the mere fact that plaintiff fell and was injured, and while an injury to a passenger may be prima facie evidence of fault on the part of the carrier, yet when that prima facie case is overcome, as this was, by convincing evidence that none of the employees of the defendant was guilty of negligence, the court could not conscientiously have permitted a verdict to stand, and it was his duty to take the case from the jury. (2) If there was any negligence upon the part of defendant's employees, the plaintiff was guilty of such contributory negligence as would prevent a recovery. He was thoroughly familiar with the handling of freight trains. There were two depots at Milan, the freight depot being some distance south of the passenger depot. When he passed the freight depot he had no right to presume that the train would not stop at the passenger depot. His inattention, or carelessness, in this matter can not be excused. He stood up to take off his overcoat in a freight train not yet out of the yards. He had no right to presume that it would not make another stop. He was familiar with the action of freight trains and knew that it was incumbent upon him to use a higher degree of care than if he were in a passenger train. Harris v. Railroad, 89 Mo. 233; Tuley v. Railroad, 41 Mo. App. 432; Smotherman v. Railroad, 29 Mo. App. 265; Olds v. Railroad, 5 Am. Neg. Rep. 38; Jones v. Railroad, 4 Am. Neg. Rep. 324; Minock v. Railroad, 97 Mich. 425; Wharton on Neg., sec. 302; Beach on Contributory Neg., sec. 737. It is for the court to say, in the first instance, whether the showing made by plaintiff, with every reasonable inference therefrom favorable to him, legit-

mately tends to support the issues in his behalf.   Carroll v.
Trans. Co., 107 Mo. 660; Stepp v. Railroad, 85 Mo. 235;
Heinze v. Railroad, 71 Mo. 636; Powell v. Railroad, 76
Mo. 80.

BRACE, P. J.—This is an action for personal injuries
in which, at the close of the evidence, the court sustained a
demurrer thereto, and instructed the jury to return a verdict
for the defendant. From the judgment on the verdict re-
turned in pursuance of such instruction the plaintiff appeals.
The only question in the case is whether the court erred in sus-
taining the demurrer.

The material evidence in the record on which this ques-
tion must be determined is as follows:

The plaintiff who is six feet one inch tall and weighs from
220 to 225 pounds, and who was forty-one years old at the
time of the trial, testified as follows in chief:

"On February 25, 1898, I was a traveling salesman for
Bowman, Boyer & Co., of Keokuk, Iowa. On the twenty-
fourth I had been in Milan, stayed all night there. The next
morning I was going to Green Castle. I went down to the
depot that morning (the twenty-fifth) I think something after
seven o'clock—close to seven. I made inquiry there about
what time the train would leave. They said the train would
not probably get out of Milan before nine o'clock. I bought
a ticket for Green Castle and stayed around the depot until
the train came in. It was up around the yards doing its
work, and after they apparently got the work done in the yards
they pulled down to the water tank. The water tank I think
is south from the depot; not being acquainted in Milan, I can
not exactly tell the points of the compass. I do not know how
far the water tank was from the depot. I never paid any at-
tention to it since. That morning I noticed quite a length of
freight train, and it was the length of that train. It was quite
a distance back from the depot. I said to the agent, 'Will the
train stop here at the platform?' He said, 'No, it will possi-

bly not stop at the platform; you had better go back there and get on; when they are late they will put right out.' I got on at the water tank, and the train started out. A man by the name of Rickett got on with me, and there was one other man on the train, both strangers to me. The train started out; and just as the caboose had got a little past the depot, I supposed the train had pulled out for good; and I raised up in my seat to take off my overcoat, and I stepped out of the seat kind of sideways, and I had my left arm throwed out like that, when all at once the train stopped suddenly and it throwed me. There was a seat directly in front of me that had no back on it, it was broke off; and the next seat was turned the other way and the other one this way and throwed two backs together; and I struck my back and side right across those two seats; and I went on there with force enough that I broke them right down, and it kind of stunned me at first, and it knocked the breath out of me and I lay there for a half-minute, and got up and sat down in the seat. I could hardly speak and could hardly catch my breath....... I went on to Green Castle and got off there. I could hardly get up town. When I went up street I vomited blood, and went and saw a doctor. That night I took the passenger train for my home at Cedar Rapids, Iowa, and got there next day. On my arrival home I called in two physicians, Drs. Raymer and Kegley. I had two ribs broken, and three or four more loose from my backbone, and my spine was hurt. I was confined to the house seven or eight weeks. I wore a plaster cast. I was then out on the road for three days, but had to go back home. I did not go out again at all. I stayed until I lost my position. Every time I take a little cold it seems to settle in this side, and my spine and my kidneys have been bad ever since. I have been doctoring for them and they are still bad. At the time of this injury I was getting $125 per month and expenses, and then a commission over and above certain sales. Had been for years. I paid my physicians and nurse about

$200.    My expenses outside of that were probably $50 or $75."

On cross-examination:    ..... "I went down to where the caboose was.    It was a combination car—something after the order of a passenger car, had seats in it with slat backs. It was not built like the ordinary caboose.    The rear end had seats the same as in a passenger car, only they were not upholstered; they were of oak.    I got on at the rear end of that car—went in at the rear door.    I sat down on the east side right next to the rear end of the car.    As the train pulled out I got up to pull off my overcoat.    I have been traveling for nearly twenty-two years.    I have ridden over nearly all the roads in North Missouri and Iowa.    I know the jar and jolts one is subject to.    I braced myself to be in position, so if it took slack or anything, to protect myself.    I knew that freight trains in order to be pulled and handled had to have more or less slack, and that in starting and stopping, slack is liable to cause jars and jolts, and oftentimes throw men down when they are sitting in the seats.    I have been on trains when that happened.    I knew that most of the trains that run have some of the cars equipped with air, and that makes a more sudden stop than the old style hand brake.    As the train pulled up I got up to take off my coat.    I was standing out in the aisle. As the jar came with the stop of the train I did not go kind of sideways down the aisle.    I stood braced in this shape, and when they came up with such a sudden jar it just threw me right over without any warning or anything of the kind, and I struck my back.    The seat right next to me had no back. The next seat was turned right over so the two backs came together.    I was out in the aisle with my feet some distance apart so as to brace myself.    I was facing west, toward up town.......I bought a ticket shortly after I went down to the depot.    I sat around the depot and waited.    The first I noticed the train when it came in it was further up from the water tank.    It was further south.    I didn't pay much atten-

tion to that. I know they were switching around up there for some little time. After the train pulled down so that the caboose was about at the water tank, I spoke to the agent and asked him whether they would stop at the platform. He said it would be better to go on down there as they were behind time and that they probably would not stop." . . . .

On re-direct examination: "There had been no slackening up of the train as they were going by the depot as they pulled out. I can not state at what rate of speed they were going. They were moving right along at pretty good speed, and the train came to a sudden stop."

J. W. Rickett testified for plaintiff as follows: "Am in the grocery business. I met Mr. Wait that day on the train. I was at the depot that morning. I think Mr. Wait and I went down to the caboose about the same time. We got in the caboose. The train pulled out in a few minutes. It was not long. Well, as we passed the depot, just as we were pulling out, we were moving along slowly and Mr. Wait got up to take his overcoat off; and in the act of taking his coat off the train stopped suddenly, and he went over against the back of the seat and tore that off. There were two seats turned; he was in that seat and he stepped out, and as I understand it he was thrown against that seat there and broke it down. The train stopped suddenly. It came to a full stop. I think the train stopped a little south of the depot but I would not be positive about that: it might have been right opposite the depot. I did not look out to see. If it was south of the depot we had not passed the depot at all. I am not sure about that. I am not positive where it stopped. It did not stop very long before it pulled out. No passengers got on. No one was in the car at the time of the accident, except Mr. Wait, Mr. Hume and myself. I think the conductor came in there before the train pulled out. The conductor or the brakeman one came in there, and there was some kind of conversation. I do not remember what it was. That was after the accident. About the time the train

pulled out.   Mr. Wait got off the train at Green Castle."

On cross-examination: "Mr. Wait got on down near the water tank.   We both took seats.   I was sitting right opposite him.   On the south side.   We had made a double seat. I was sitting in one and he in the other.   I think facing each other, but I would not be positive.   He did not fall over me when he fell.   I do not know anything about our pulling up just like freight trains do when they are switching around in the yard.   We were moving slowly.   I do not know whether they had passed the freight depot; I can not say whether it was south of the depot or opposite the depot, or just as I stated before.   There is a freight depot south of the depot—used to be the passenger depot.   I can not say whether we had passed that or not.   It was in the immediate neighborhood of the depot.   I do not know how far we had got from the time we had commenced going; take a man in a car moving along that way and he can not tell, not noticing; he can not tell, nobody can tell.   I was not hurt.   I was sitting down."

The evidence of the defendant tended to prove that plaintiff was the only one hurt in the car.   That it was the custom of freight trains to stop their caboose at or near the platform of the station.   That the engineer was a careful, first-class engineer. That he pulled the train up to the station in the usual manner, stopping the caboose in like manner at or near the platform. That the train was of ten cars, one of which was a Santa Fe car with a quick-action brake, picked up in the yards there with one or two other cars.   That freight trains are subject to more severe jars and jolts than passenger trains, from the fact that they can not be coupled so close and stiff, and their violence is increased by a car having a quick-action brake in the train, a fact which the engineer can not ascertain until he makes application of the air.   That the engineer first ascertained the fact that such a car was in his train by this stop, which was the first made after the car had been put in.   That when a train is made up of cars, some having air brakes and some without, as

this one was, the air cars are put ahead and the others in the rear, and as the air is applied the slack runs up, and the cars at the front don't jolt as do the cars in the rear.

(1) It seems now to be well-settled law here, as elsewhere, that where a railroad company carries passengers for hire on its freight trains "it must exercise the same degree of care as is required in the operation of its regular passenger trains, the difference only being that the passenger submits himself to the inconvenience and danger necessarily attending that mode of conveyance." [Whitehead v. St. Louis, I. M. & S. Ry. Co., 99 Mo. 263; McGee v. Mo. Pac. Ry. Co., 92 Mo. 208; Wagner v. Mo. Pac. Ry. Co., 97 Mo. 512; Hays v. Wabash Ry. Co., 51 Mo. App. 438; Guffey v. Han. & St. J. Ry. Co., 53 Mo. App. 462; Ohio & Miss. Ry. Co. v. Dickerson, 59 Ind. 317; Chicago & Alton Railroad v. Arnol, 144 Ill. 261; Olds v. New York, etc., R. R. Co., 172 Mass. 72.] The rule upon this subject is very clearly expressed in the two cases last cited. In the last one, decided by the Supreme Court of Massachusetts in 1898, KNOWLTON, J., speaking for the court, said: "The law is clearly expressed in Chicago & Alton Railroad v. Arnol, 144 Ill. 261, 270, as follows: 'Persons taking passage upon freight trains, or in a caboose or car attached to a freight train, can not expect or require the conveniences or all of the safeguards against danger that they may demand upon trains devoted to passenger service, and are accordingly held to have accepted the accommodation provided by the company, subject to all the ordinary inconveniences, delays, and hazards incident to such trains, when made up and equipped in the ordinary manner of making up and equipping such trains, and managed with proper care and skill. . . . . But if a railway company consents to carry passengers for hire by such trains, the general rule of responsibility for their safe carriage is not otherwise relaxed. From the composition of such a train and the appliances necessarily used in its efficient operation, there can not, in the nature of things, be the same immunity

from peril in traveling by freight train as there is by passenger trains, but the same degree of care can be exercised in the operation of each. The result in respect of the safety of the passenger may be wholly different, because of the inherent hazards incident to the operation of one train and not to the other, and it is this hazard the passenger assumes in taking a freight train, and not hazard or peril arising from negligence or want of proper care of those in charge of it.' .... The plaintiff in the present case well understood the kind of business in which the defendant was engaged, and the manner in which the business was conducted. So far as there were dangers naturally incident to the running of freight cars and a passenger car in the same train, the parties must be presumed to have contracted in reference to them, and the plaintiff to have assumed them."

And the same must be said of the plaintiff in the case in hand, who in his evidence says: "I knew that trains in order to be pulled and handled had to have more or less slack, and that in starting and stopping, slack is liable to cause jars and jolts, and oftentimes throws men down when they are sitting in the seats. I have been on trains when that happened. I knew that most of the trains that run have some of the cars equipped with air, and that makes a more sudden stop than the old style hand brake."

There is no conflict in the evidence. There is no evidence tending to show any defects in defendant's track, train or any of its appliances. No evidence tending to show any want of skill or care on the part of its employees in the management of the train from the time plaintiff got on it until the accident happened, or that the train was stopped at an improper place, or in an improper manner, or that the shock which caused his fall was not a natural and ordinary incident of the stopping of such a train in a proper manner, by the proper application of the proper means, for that purpose. In other words, there were no facts proved from which an inference of negligence on the part of defendant could be legitimately drawn. On the

other hand, it clearly appears from the plaintiff's own evidence that his injury was the result of his own mistake. He left his seat, stepped into the aisle, and commenced pulling off his overcoat because, as he says, he thought the train was pulling out "for good." In fact it was pulling up to the station "to stop." Under this mistake he placed himself in such a position as not to be able to resist the force of the shock which was naturally incident to the stop, fell and was injured. But for it he would have remained in his seat and in all human probability would have remained uninjured as did the others in the car.

For the consequences of his mistake the defendant can not be held liable. It is true a faint effort was made by the plaintiff in his examination in chief, to unload the responsibility for his mistake upon the defendant's station agent, but upon cross-examination he qualified his first statement as to what the agent said by testifying that what the agent said was "That it would be better to go down there, as they were behind time, and they probably would not stop." This conversation took place when neither of them knew what the actual movement of the train would be, was mere advice based upon an opinion, upon which the plaintiff had no right to rely for his personal safety, and upon which his own evidence shows he did not rely, since he kept his seat until he thought the train had passed the stopping place, and even when he left his seat braced himself for an expected shock. It follows that the court did not err in sustaining the demurrer to the evidence, and its judgment is affirmed. All concur.