NEWTON L. RAY, Respondent, v. CHICAGO, BUR-
LINGTON & QUINCY RAILWAY COMPANY,
Appellant.

**St. Louis Court of Appeals, March 8, 1910.**

1. **CARRIERS OF PASSENGERS: Injury to Passenger: Freight
Train: Proximate Cause of Injury.** Where a passenger on a
freight train attempts to board it while moving and actually
grabs the handrods and gets his feet on the steps of the
caboose and is then thrown off by a jerk of the train, any
antecedent negligent acts of the operatives of the train in-
ducing the passenger to attempt to get on could not be the
legal cause of the injury.

2. ———: ———: ———: **Risks Assumed.** A person who takes
passage on a freight train assumes the risk of injury from
such jars and movements as are incident to its operation, if
its parts are well constructed and in good repair and it is
properly operated on a safe track, but does not assume the
risk of injury from faults in either of these matters.

3. ———: ———: ———: **Jerks: Res Ipsa Loquitur.** The mere
fact that a person, in attempting to board a moving freight
train, which was getting under full speed, is thrown off by a
jerk of the train, does not warrant the conclusion of defective
track or train appliances or negligent operation, and hence the
doctrine of *res ipsa loquitur* does not apply.

4. ———: ———: ———: **Unusual Jerks: Evidence: Competency
of Expert Witness.** A passenger who is jerked from a freight
train does not qualify as an expert, entitled to give an opinion
that the jerk was an extraordinary one, by testifying that he had
had considerable experience on such trains and had shipped
stock over the road for seven years, not testifying how often
he accompanied his stock.

5. ———: ———: ———: ———: **Opinion Evidence: Non-Expert
Witness.** An expression of opinion by a non-expert witness that
a jerk of a freight train was an unusual and extraordinary one
possesses no probative value.

6. ———: ———: ———: **Jerks: Evidence Insufficient to Show
Negligence: Facts Stated.** In an action against a railroad com-
pany for injuries to a passenger by being jerked from the rear
platform of a freight train caboose, which he had just boarded,

the train being in motion when he did so, where there was no evidence to prove the train or caboose was in imperfect condition, the track out of order, or the existence of any physical defect that could cause an unusual jar or jerk of the train, and no article on the train or caboose was misplaced nor any person but plaintiff disturbed, and the only evidence adduced with respect to the character of the jerk was that given by plaintiff, who testified it was an unusual and extraordinary one, it is *held* there was no substantial evidence the jerk was imputable to defendant's negligence.

Appeal from the Lewis Circuit Court.—*Hon. Chas. D. Stewart,* Judge.

REVERSED.

*E. L. Marchand, R. W. Ray* and *Trimble & Trimble* for appellant.

(1) The burden of proving the negligence charged in this case, rests on respondent. Bartley v. Railroad, 124 Mo. 140; Hite v. Railroad, 130 Mo. 136; Guffey v. Railroad, 55 Mo. App. 466; Hedrick v. Railroad, 195 Mo. 104; Garvin v. St. Louis, 151 Mo. 334; Saxton v. Railroad, 98 Mo. App. 503; Schaffer v. Railroad, 128 Mo. 64; Yarnell v. Railroad, 113 Mo. 570; Railroad v. MacKinney, 135 Pa. St. 402, 37 Am. and Eng. 158; Curtis v. Railroad, 18 N. Y. 534; Railroad v. Kuhn, 6 S. W. (Ky.) 441; Elliott on Railroads (2 Ed.), S. 1644, notes 228, 229, 230 and 231; Woas v. Railroad, 198 Mo. 664. (2) It is a matter of common knowledge that jerks and jolts are incident to freight trains. Courts take judicial notice of these incidents. Young v. Railroad, 113 Mo. App. 636, 84 S. W. 176; Erwin v. Railroad, 94 Mo. App. 289; Prior v. Railroad, 85 Mo. App. 367; Wart v. Railroad, 165 Mo. 612; Hedrick v. Railroad, 195 Mo. 104; Portuchek v. Railroad, 101 Mo. App. 54; Olds v. Railroad, 172 Mass. 73; Railroad v. Priol, 144 Ill. 261; Guffey v. Railroad, 53 Mo. App. 462. (3) Evidence in the nature of the conclusion of a witness that the jerk was extraordinary is of no value.

Hedrick v. Railroad, 195 Mo. 104; Portuchek v. Railroad, 101 Mo. 54; Wart v. Railroad, 165 Mo. 612; Erwin v. Railroad, 94 Mo. App. 289; Bartley v. Railroad, 148 Mo. 124; Guffey v. Railroad, 53 Mo. App. 465; Hite v. Railroad, 130 Mo. 136; Saxon v. Railroad, 98 Mo. App. 501; Henry v. Railroad, 76 Mo. 293. (4) Evidence that there was a hard jerk is not sufficient to raise a presumption of negligence. The evidence must go further and show that the jerk resulted from a defect in track or machinery or misconduct of trainmen. Bartley v. Railroad, 148 Mo. App. 124; Hite v. Railroad, 130 Mo. 136; Guffey v. Railroad, 53 Mo. App. 462; Hedrick v. Railroad, 195 Mo. App. 104; Wait v. Railroad, 165 Mo. 612; Railroad v. Arnold, 144 Ill. 261; Erwin v. Railroad, 94 Mo. App. 289; Saxon v. Railroad, 98 Mo. App. 501; Holt v. Railroad, 84 Mo. App. 443; Prior v. Railroad, 85 Mo. App. 378. (5) Starting the train without warning respondent that the caboose would not stop at the platform, was not the proximate cause of the injury. Saxon v. Railroad, 98 Mo. App. 501; Blue v. Railroad, 98 Mich. 225; Ins. Co. v. Boon, 95 U. S. 117. (6) The statement of the brakeman was not an order. It was a mere statement that the train would not stop. Heaton v. Railroad, 65 Mo. App. 479; Hunter v. Railroad, 126 N. Y. 18; Murphy v. Railroad, 43 Mo. App. 343; Vincent v. Railroad, 71 Iowa 58, 32 N. W. 100; Lindsey v. Railroad, 47 Iowa 407, 20 N. W. 737; Dietrick v. Railroad, 58 Md. 347, 11 Am. and Eng. R. R. Cas. 115. There is no presumption that the brakeman had authority to order or direct Ray to board the caboose. Farber v. Railroad, 116 Mo. 81. (7) The attempt to board a train in motion is presumptive negligence. 1 Fetter on Carriers, p. 378, sec. 149. (8) Plaintiff cannot justify his act in attempting to board the train while in motion except by showing that he acted under coercion of circumstances. This he wholly fails to do. Heaton v. Railroad, 65 Mo. App. 479; Solomon v. Railroad, 103 N. Y. 437; Hinton v. Railroad,

126 N. Y. 18; Victor v. Railroad, 30 Atl. (Pa.) 38. (9) Technical phrases in instructions constitute error. Mulderig v. Railroad, 94 S. W. 801.

*O. C. Clay* and *A. F. Haney* for respondent.

(1) Railroad companies are held to the highest care and skill in preventing injuries to their passengers "which prudent men would use and exercise in a like business and under like circumstances." Redmon v. Railroad, 185 Mo. 1; Jackson v. Railroad, 118 Mo. 199; Higgins v. Railroad, 36 Mo. 418; Sullivan v. Railroad, 133 Mo. 1; Tillman v. Transit Co., 102 Mo. App. 553; Huelsenkamp v. Railroad, 37 Mo. 537. But, on the other hand, the law requires of the passenger no more than the exercise of ordinary care for his safety. Mitchell v. Railroad, 112 S. W. 291; Huelsenkamp v. Railroad, 37 Mo. 537; Hensler v. Stix, 113 Mo. App. 162. (2) Where a railroad company carries passengers for hire on its freight trains, it must exercise the same degree of care as is required in the operation of its regular passenger trains, the difference only being that the passenger submits himself to the inconvenience and danger necessarily attending that mode of conveyance. Wait v. Railroad, 165 Mo. 612; Irwin v. Railroad, 94 Mo. App. 289; Guffey v. Railroad, 53 Mo. App. 462; McGee v. Railroad, 92 Mo. 208; Wagner v. Railroad, 97 Mo. 512; Whitehead v. Railroad, 99 Mo. 263; Mitchell v. Railroad, 112 S. W. 291. (3) The fact that the jerk in evidence was of sufficient violence to break plaintiff's hands loose from the handholds, and throw him from the car steps over the railing back of the car steps onto the railroad track, is sufficient evidence of the unusual and extraordinary character of the jerk, and prima-facie proof of the negligence of defendant's servants in the management of the train, and cast upon the defendant the burden of showing the jerk was produced by causes consistent with the careful management of the train. Plaintiff's direct evidence as to the unusual violence of

the jerk is also proof of defendant's negligence. Dougherty v. Railroad, 81 Mo. 325; Murphy v. Railroad, 43 Mo. App. 342; Dorsey v. Railroad, 83 Mo. App. 528; Mitchell v. Railroad, 112 S. W. 291; Hite v. Railroad, 130 Mo. 132; Condy v. Railroad, 13 Mo. App. 587; Bussell v. Railroad, 125 Mo. App. 441; Fullerton v. Railroad, 84 Mo. App. 498. (4) Where the facts are before the jury, the presumptions or inferences they warrant are for the jury. Cambron v. Railroad, 165 Mo. 543; Dorsey v. Railroad, 83 Mo. App. 528; Butts v. Bank, 99 Mo. App. 168. (5) The courts will not, as a matter of law, declare a person guilty of contributory negligence who attempts to get on a train while it is moving slowly, especially at a platform. The question of contributory negligence in such cases should be determined by the jury, under the guide of proper instructions, in the light of all the attending circumstances. Fulks v. Railroad, 111 Mo. 335; Schaefer v. Railroad, 128 Mo. 64; Hansberger v. Railroad, 82 Mo. App. 566; Peck v. Transit Co., 178 Mo. 617; Swigert v. Railroad, 75 Mo. 475; Eikenberry v. Transit Co., 103 Mo. App. 442; Spencer v. Transit Co., 111 Mo. App. 653. (6) Knowledge or notice may be proved either by direct evidence or inferred from other facts and circumstances. Rine v. Railroad, 100 Mo. 228. (7) Even if appellant's charge were true that respondent's instructions numbers 12 and 13 improperly included acts of negligence on the part of defendant's servants, in addition to that consisting in the negligent jerking of the train, yet that could be no ground for reversal. Gibler v. Railroad, 129 Mo. App. 93. (8) Under circumstances where it would not be negligence as a matter of law for plaintiff to get on or off a moving train, the statement of the brakeman to plaintiff to get on is to be regarded as a direction or invitation. Fillingham v. Transit Co., 102 Mo. App. 573; Seymour v. Railroad, 114 Mo. 266; Waller v. Railroad, 83 Mo. 608. (9) The use of the term "proximate cause" in instructions on negligence is sanc-

tioned. Deschner v. Railroad, 200 Mo. 310; Harrison
v. El. Light Co., 195 Mo. 606. (10) Where the instruc-
tions asked by defendant are too voluminous the trial
court would be upheld in refusing even all of them.
Dakin v. Mercantile Co., 197 Mo. 238; Heman v. Hart-
men, 189 Mo. 20. (11) (a) Plaintiff assumed only the
risk of injury resulting from the usual or ordinary
jerks and jars incident to the operation of the freight
train. (b) Plaintiff did not assume the danger arising
from the negligence or want of proper care of those
in charge of the train. Mitchell v. Railroad, 112 S. W.
291.

GOODE, J.—Appeal from a judgment for dam-
ages given to compensate plaintiff for a personal injury
found to have been caused by the negligence of defend-
ant's servants. Plaintiff had shipped a carload of cattle
in a freight train from Canton, Missouri, over defend-
ant's railroad destined ultimately to Chicago, Illinois,
over a route which extended through West Quincy, Mis-
souri. The train passed southward to LaGrange, be-
tween Canton and West Quincy, where about noon it
took a sidetrack to let a passenger train pass.
Plaintiff had accompanied the shipment, and while the
freight train was on the sidetrack at LaGrange, he
asked the rear brakeman (Gilfillan) if he (plaintiff)
would have time to attend to his cattle. The brakeman
replied there would be plenty of time; whereupon plain-
tiff left the caboose and paid some attention to his stock
while the train was on the switch, walked from there to
the depot, and again noticed the cattle after the train
had moved to the depot on the departure of the passen-
ger train. The freight train consisted of twenty-one
cars, and as it stood at the depot on the main track,
the engine and six or seven cars were south of the depot
door and the remainder of the cars, with the caboose
at the rear, were north of the door, the course of the

train being southward. When plaintiff went to the depot after first attending to his stock, he saw there the same brakeman who had told him he would have time to look after his cattle, and inquired of said brakeman when the train would start; but received an unresponsive answer. This occurred about five minutes before the train started to leave the station, where it remained a half-hour or more. The conductor was at the depot, saw plaintiff waiting there, knew he was a passenger on the train and that he was the only passenger, but said nothing to plaintiff nor plaintiff to him. Instead of getting on the caboose, plaintiff remained on the platform until the train had started, and then endeavored to board it as it passed him, going at a speed of from three to three and one-half miles an hour, he testified. Before making this attempt, he asked the brakeman, Gilfillan, who was standing on the platform of the caboose, to stop the train or slow it up so he could get on. Plaintiff said the caboose was just starting when he made this request, and "had not got down there yet," meaning, we presume, to the portion of the platform where he was standing. Gilfillan replied he would not stop the train or slow it down, and if plaintiff wanted to get on he would have to jump on. Plaintiff stated what passed between him and the brakeman with immaterial variations, and we quote one or two versions: "I asked him if he had not better slow the train so I could get on; he said: 'No, I will not slow up any; if you want to get on this train, jump on.'" Again: "I told the brakeman to slow the train up so I could get on; the caboose was just starting; it had not got down there yet; he said he would not do it; if I wanted to get on that train I would have to get on." The caboose would have moved some five hundred feet before it reached plaintiff. Testimony was put in to show it was the custom of stockmen on defendant's line to leave cabooses of freight trains at stations to attend to their stock upon statements of the trainmen that they would

have time to do so and as to when the train would leave the station. Much evidence was given that the train was moving at a more rapid speed when plaintiff attempted to get on board than he testified—at a rate of eight or ten miles an hour. Plaintiff took hold with each hand of the rods at the sides of the steps of the caboose, put his feet on the lower step and was in the act of putting one on the next step when there was a sudden and violent jerk of the train, the hold of his hands on the rods was loosened, he was thrown backward over the rear railing, fell between the rails of the track and sustained a severe injury to his knee, besides other injuries. We quote from plaintiff's testimony: "After he told me to get on the train I started to the train—down the track the way the train was going—not very fast but in a good walk. I stepped one foot on the lower step, caught the iron with my right hand and one with my left hand, and got both feet on the lower step; just as I went to step up on the other step, there came a jerk of the car and threw me over the back of the railing on to the steps;" (so the record reads). "The train went on; there was no one there; I tried to get up and found I could not get up; crawled up to the depot platform, got up, crawled up with one knee, and sat down, and was sitting there when Mr. Mitchell came up to the depot." The accident has been described according to the testimony for plaintiff for the purpose of passing on the contention of defendant of lack of proof of negligence in handling the train, and conclusive proof that plaintiff's own carelessness caused or contributed to his injury. The evidence for defendant conduced strongly to prove plaintiff had no conversation with Gilfillan at LaGrange, was not told by the latter to get on the caboose as it was moving, the conductor did not see plaintiff on the platform, there was no jerk of the train at all, plaintiff was hurt by grabbing the rods of the caboose in an improper way as the train was moving rapidly, from ten to twelve

miles an hour and that he never got his feet on the step. The station agent who stood near and saw the accident, describes it thus:

"As Mr. Ray attempted to board the train he got up near the platform as he saw the caboose approach the point where he was standing and stood there, and just as the caboose passed him he grabbed with both hands the handhold and grabiron just like any man would that didn't know anything about getting on a moving train. He stood perfectly still and the train jerked him in such a manner—he had a stick in his hand—and that swung him around, the force of the train, that broke his left handhold and he fell on the track facing west. . . . He got hold of the handhold, and, by the force of the train, it jerked him three or four steps, and by that time his right hand broke loose and he was still holding with his left hand to the grabiron, which is straight up and down, when the force of the train threw him around. . . . He got hold of the grabiron and also the handhold when he attempted to get on, and his right hand broke loose and he still held on with left hand with the stick in his hand when it swung him around the end of the car and he let loose and it swung him around on the rail when he dropped down.

"Q. About how fast in your judgment, was that train running when Mr. Ray undertook to board it? A. About eight or ten miles an hour.

"Q. State whether or not he got his feet, or either of them, on the step of the car during the time he fell off. A. No, he didn't touch the car only with his hands.

"Q. Where were his feet from the time you saw him take hold of the grabiron? A. On the platform.

"Q. Prior to the time when the train started from the depot, what were you doing? A. Just standing doing nothing."

Testimony was given regarding the duties of the rear brakeman, the tendency of which was to prove he was the "head brakeman." or member of the train crew in authority in regard to the movements of the train and looking after the safety of passengers in situations which were not under the observation of the conductor. This testimony was given by the engineer:

"Q.  State whether you did anything or performed any act that would cause a jerk?  A.  We did not.

"Q.  Could the brakeman give the signal to stop the train if he wasn't on the train and was on the platform, after that train has run anywhere from 800 to 1000 feet, if the brakeman was standing on the platform, and how could he do it without getting on the train?  A.  He could not do it.

"Q.  Is it your duty to be looking back after signals after you get your signal to go ahead?  A.  No.

"Q.  What is your duty after you start out; I don't mean while switching around in the yards, but after you get the signal to go to the next station, what do you do?  A.  It is our duty to watch on ahead so that I hit nothing or any persons or anything.

"Q.  State whether or not it is your duty then to be looking back?  A.  It is not."

A written statement signed by plaintiff a short time subsequent to the accident, was introduced to contradict his testimony given on the stand.  The tendency of the document was to prove the accident was due to plaintiff's attempt to get on the train when it was moving too rapidly for the attempt to be prudent.  Plaintiff testified the paper was signed while he was still ill from his injuries and had been taking morphine; and that it was neither read by nor to him.  Several witnesses said plaintiff narrated the accident to them and laid it to his missing his footing when he tried to get on the caboose because the speed was too high.  Plaintiff attempted to qualify as an expert witness in respect of shocks and jerks of freight trains by saying

he had had "considerable experience" on such trains, and had shipped stock over this road for seven years, not testifying how often he accompanied his stock.

The case has been exhaustively briefed from various points of view by counsel on both sides, but we think incidents which are unimportant have been dwelt on as tending to establish or refute the company's liability. The churlishness shown by the brakeman in not informing plaintiff when the train would leave in response to an inquiry, the omission of the conductor who saw plaintiff waiting on the platform to warn the latter before starting, and what the brakeman said to him about getting on the caboose as it moved past the platform, which is treated as an invitation to get on and as an assurance that he might safely do so, and failure to stop for plaintiff, are all drawn into the argument as facts going to show liability. For defendant, plaintiff's loitering about the platform after he had attended to his cattle, instead of getting on the caboose before the train moved, as he might have done, is said to show he was injured through his own fault, and the statement of the brakeman is argued to have been no more than a license to him to take the risk of boarding the caboose. Those circumstances strike us as immaterial because, according to plaintiff's own narrative, which we accept as true for the purposes of the appeal, he succeeded in getting on the steps of the caboose in safety. He testified he was thrown to the ground after he had grasped the handrods at the back platform with either hand, had set both feet on the bottom step and was in the act of putting one foot on the second step; that at this moment a jerk of the train occurred and threw him overboard. It follows the proximate cause of the accident was this jerk; not an antecedent act of negligence by either defendant's employees or plaintiff; and in instructions given for defendant, the court below so charged and conditioned the right to recover on findings of negligent handling of the train by the engineer and of due

care on the part of plaintiff. This accorded with the position taken by counsel for plaintiff as regards his alleged contributory negligence; for they say if he attempted to board the train when it was rash to do so, or made the attempt in a careless way, these circumstances could not have contributed to his fall since he succeeded in getting on safely and was afterwards thrown off. By the like reasoning it follows the antecedent acts of negligence, if any such occurred, on the part of defendant's train crew, were not the legal cause of the casualty. Therefore the question for decision is whether the jerk which precipitated plaintiff to the ground is attributable proximately to any negligence of defendant. The evidence relied on for this purpose was twofold: The testimony of plaintiff himself that the jerk was an unusual and extraordinary one; and the supposed effect of it in hurling him to the ground. A careful study of the entire record, in the light of precedents, has satisfied us there was no substantial evidence the jerk was imputable to defendant's negligence. The law governing the liability of railroad companies for an injury to a passenger on a freight train by oscillations of the train has been expounded in numerous decisions in this and other jurisdictions. A person who takes passage on that kind of train, assumes the risk of injury from such jars and movements as are incident to its operation, if its parts are well constructed and in good repair and it is properly operated on a safe track; but does not assume the risk of injury from faults in either of those matters, or perhaps kindred ones which an experienced railway man could enumerate but we cannot. [Hedrick v. Railroad, 195 Mo. 104, 93 S. W. 268.] The jerk said to have thrown plaintiff off his balance had no other noticeable consequence; it was not in evidence any article on the train or caboose was misplaced nor any person but plaintiff disturbed. The rear brakeman, who was standing on the rear platform, was not thrown off nor violently jostled. We are pointed to the fact that

the hold of plaintiff's hands on the rods was loosened by the jerk; but the degree of violence required to do this would depend on how tightly he was clasping the rods and also the firmness of his position on his feet. Under some circumstances a slight jar of a train will unbalance a person. It is in proof that while a train is leaving a station, the power of the steam is applied gradually, instead of being turned on at once in full force, and, indeed, the petition in the present case alleges the train was moving at an "accelerating speed." Taking into consideration the oscillations and jerks commonly and necessarily incident to the movement of a freight train and that this train was getting under full speed, we hold the mere fact that plaintiff was thrown off by a jerk did not warrant the conclusion of defective track or train appliances, or negligent operation; in other words, the doctrine of *res ipsa loquitur* does not apply. This is the necessary result of the cases cited infra, wherein it was held the evidence for the plaintiffs did not entitle them to a decision by the jury. This plaintiff said the jerk was an unusual and extraordinary one, but the cases hold such expressions of opinion by a nonexpert witness are not of probative value; and plaintiff no more qualified as an expert than did the witnesses in the following cases, who gave testimony tending to prove the shocks in issue were of unusual violence. Indeed his qualifications were inferior to some of said witnesses whose testimony was rejected. [Guffy v. Railroad, 53 Mo. App. 156; Hawk v. Railroad, 130 Mo. App. 658, 108 S. W. 1119; Hedrick v. Railroad, 195 Mo. 104, 93 S. W. 268; Wait v. Railroad, 165 Mo. 612, 65 S. W. 1028.] We are controlled by decisions of the Supreme Court and influenced by the decisions of other courts given in analogous cases, where the evidence relied on to show the accidents were occasioned by negligent jerks in the movement of freight and other trains, was stronger than it is in the case at bar, and yet there was held to be no evidence tending to estab-

lish liability on the part of the railroad companies. Those authorities do not leave us free to determine this case according to general doctrines and as though it were one of first impression; but our judgment approves the conclusions reached in said cases. Plaintiff's counsel have endeavored to distinguish them from this one on the facts and show they ought not to control our decision; but the attempt has been unsuccessful. The record before us contains nothing to prove the train or caboose was in imperfect condition, the track out of order, or any physical defect existed which would cause an unusual jar or jerk of the train. That the engineer suddenly put on more steam power than was consistent with the safety of a passenger on the train, is to be deduced, if at all, from plaintiff's testimony about the jerk being extraordinary and his fall. But, as we have said, such incidents, unaccompanied by results more indicative of violence, are not accepted as evidence from which to conclude an accident was not caused by a jar common on freight trains. If the engineer had known plaintiff had just got aboard and was standing on a step of the caboose, he might have been remiss in care for plaintiff's safety in that situation, if the train was not handled more quietly than otherwise would have been required, because a slighter jar would imperil plaintiff than when he was in the caboose. But there is nothing to show the engineer had reason to believe plaintiff was in such a situation. The rear brakeman knew he was, but in the instant between the time plaintiff started to get on the caboose and his fall from it, the brakeman could not apprise the engineer at the other end of the train by signal or otherwise, that plaintiff was getting aboard. Plaintiff must have known these were the conditions he would have to face in getting on the caboose, as the brakeman told him its speed would not be slackened. Perusal of the following cases and others cited, supra, will demonstrate that no proof of negligence of the cogency required for submission to the

jury, was adduced. [Hedrick v. Railroad, 195 Mo. 104, 93 S. W. 268; Hite v. Railroad, 130 Mo. 132, 31 S. W. 32; Portuchek v. Railroad, 101 Mo. App. 52, 74 S. W. 368; Erwin v. Railroad, 94 Mo. App. 289, 68 S. W. 88.] Many cases have been cited by plaintiff's counsel and we have examined them, but find them inapt because the decisions were pronounced on facts unlike those before us. In some of them, the trainman or car man whose conduct caused the accident was regarded as culpably negligent because he knew of the perilous position of the injured party and the situation was such that he could have avoided it, either by stopping the train or car himself, or notifying the engineer or motorman to do so. [Murphy v. Railroad, 43 Mo. App. 43; Dougherty v. Railroad, 81 Mo. 325.] And in some cases the train had stopped or was stopping to let passengers off and the crew was presumed to be on the watch not to hurt them by a sudden lunge or shock. [Moorman v. Railroad, 105 Mo. App. 711, 76 S. W. 1089.] In others the shock of stopping, starting, running into a curve or colliding with another car, caused such displacements of inanimate objects or persons in secure positions as to bespeak careless operation. [Condy v. Railroad, 85 Mo. 78; Dosey v. Railroad, 83 Mo. App. 528; Fullerton v. Railroad, 84 Mo. App. 498; Bussell v. Railroad, 125 Mo. App. 441, 102 S. W. 613; Mitchell v. Railroad, 132 Mo. App. 143, 112 S. W. 291.] In no precedent determined on facts like we have here was a verdict for damages approved; whereas on facts more favorable to recovery verdicts were set aside by the courts of last resort of this State.

The judgment is reversed. All concur.