Patrum v. Railroad.

PAUL U. PATRUM et al., Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

Springfield Court of Appeals, July 7, 1910.

1. **RAILROADS: Negligence: Coupling Cars: Injury to Brakeman.** Plaintiff's decedent, a brakeman, was on top of an empty box car setting the brakes. The other train men were attempting to couple the cars of the freight train to a stock car which was between the empty box car and the train. The train, after one or two unsuccessful attempts at coupling, was again sent back against the stock car, and the stock car was pushed against the empty box car, which impact threw decedent from the top thereof. The evidence is examined and held by a majority of the court to be sufficient to go to the jury on the question of the negligence of defendant's servants in handling the train. NIXON, P. J., dissents, and holds that the accident was a result of one of the risks incident to the employment.

2. ———: ———: ———: **Degree of Care.** The standard by which the conduct of train men in making couplings should be measured, in determining whether or not they were negligent in handling the cars, is what an ordinarily prudent person would have done under like circumstances, and not upon whether the cars were handled in the usual and ordinary manner.

3. ———: ———: ———: **Jerks and Jars in Making up Trains.** A certain amount of bumping, jarring and jerking is well known to be incidental to the making up of trains and, under ordinary circumstances, cannot be complained of.

4. **EVIDENCE: Non-Expert Witness: Railroads: Negligence: Coupling Cars.** The testimony of a non-expert witness that a jolt given to a car in making a coupling was unusual has little, if any, probative value.

5. **ASSUMED RISKS: Railroads: Negligence: Fellow-Servants: Coupling Cars.** A brakeman on top of a box car setting the brakes does not assume the risk of the negligence of his fellow-servants in forcing a train against the car with unusual and unnecessary force while making the coupling.

6. **NEGLIGENCE: Railroads: Coupling Cars: Negligence not Inferred from Sudden Jars.** Negligence in handling a train is not to be inferred from the mere fact that a brakeman on top of a box car was thrown therefrom by a sudden jar caused in making a coupling.

Appeal from Christian Circuit Court.—*Hon. John T. Moore*, Judge.

AFFIRMED (*and certified to the Supreme Court*).

*W. F. Evans* and *John H. Lucas* for appellant.

(1) The defendant insists that neither in pleading nor in proof can the plaintiffs recover, hence the court committed error in submitting the cause to the jury. Harrington v. Railroad, 104 Mo. App. 671; Shields v. Railroad, 100 Mo. App. 517; Williams v. Railroad, 119. Mo. 316; Hager v. Railroad, 207 Mo. 302; McIntosh v. Railroad, 58 Mo. App. 285; Jackson v. Railroad, 104 Mo. 448; Bradley v. Railroad, 138 Mo. 302; Saxton v. Railroad, 98 Mo. App. 494; Ryan v. McCully, 123 Mo. 636; Yarnal v. Railroad, 75 Mo. 575; Keown v. Railroad, 141 Mo. 86; Mather v. Railroad, 64 Mo. 267. (2) "No negligence can be inferred from jolting or jerking on freight trains." 2 White, Personal Injuries on Railroad, 670; Hedrick v. Railroad, 195 Mo. 104; Portuchek v. Railroad, 101 Mo. App. 54; Wait v. Railroad, 165 Mo. 612; Erwin v. Railroad, 94 Mo. App. 289; 3 Elliott on Railroads (2 Ed.), secs. 1290-1296; Guffey v. Railroad, 53 Mo. App. 462.

*Patterson & Patterson, G. A. Watson* and *G. D. Kirby* for respondent.

(1) The question of negligence was one for the jury—where reasonable men may differ upon a given state of facts the question of negligence is one for the jury. Nagel v. Railroad, 75 Mo. 653; Manerman v. Siemerts, 71 Mo. 101; Hulin v. Railroad, 92 Mo. 440; O'Mellia v. Railroad, 115 Mo. 205. (2) There being substantial evidence to support the verdict, the appellate court should not disturb the finding and the evidence should be viewed in its most favorable aspect in support of the verdict. Cunliff v. Hausman, 97 Mo. App. 467; Lumber Co. v. Tie Co., 79 Mo. App. 543; Sinclair v. Railroad, 70 Mo. App. 588; Winters v. Railroad, 99 Mo. 509; Memphis v. Mathews, 28 Mo. 248; Lyman v. Harvester Co., 68 Mo. App. 637; Phippin v.

Railroad, 196 Mo. 321; Cohn v. Kansas City, 108 Mo. 387; Stoddard v. Railroad, 65 Mo. 514; Parsons v. Mayfield, 73 Mo. App. 309; Huth v. Dohle, 76 Mo. App. 671; Choquette v. Railroad, 152 Mo. 257; Dowling v. Wheeler, 117 Mo. App. 169; Shoe Co. v. Sally, 114 Mo. App. 222; Levels v. Railroad, 196 Mo. 606; Little v. Pump Co., 122 Mo. App. 620; Smoot v. Kansas City, 194 Mo. 573; Treffinger v. Railroad, 110 Mo. App. 453. (3) The question of the weight of the evidence was for the jury and the trial court. Conrad v. Railroad, 116 Mo. App. 517; Hurley v. Railroad, 120 Mo. App. 262; Bretzfelder v. Waddle, 122 Mo. App. 262; Gorton v. Insurance Co., 115 Mo. App. 69. (4) The jury are at liberty to disregard the testimony of several witnesses even when uncontradicted. Roos v. Clark, 14 Mo. App. 594; Gregory v. Chambers, 7 Mo. App. 557; Clark v. Skrimski, 77 Mo. App. 172; Tower v. Panley, 76 Mo. App. 287; Wolff v. Campbell, 110 Mo. 114.

Cox, J., being disqualified to sit in this cause and Judges Nixon and Gray being unable to agree, by stipulation of attorneys, V. O. Coltrane was named as special judge to sit in the hearing of this cause.

Coltrane, Special Judge.—This is an action for damages for the death of Henry A. Patrum, a brakeman, brought by his minor children through their curator and next friend, against defendant in whose employ Patrum was at the time of his death. At the close of plaintiff's evidence, defendant asked a peremptory instruction that plaintiffs were not entitled to recover, which was overruled. Defendant not offering any evidence, the case was submitted to the jury under instructions, and a verdict in favor of plaintiffs was returned for five thousand dollars. Plaintiffs remitted five hundred dollars and judgment was rendered for forty-five hundred dollars.

The jury having found the issues in favor of plaintiffs, the evidence should be viewed in its most favorable aspect to support the verdict. Before setting out evi-

dence as to the main point in controversy, it may be well to state the general facts that the evidence tended to establish.

There were three tracks on defendant's line of railway at Mansfield, Missouri; these tracks were designated as "main line," "passing track" and "stock track." There was a slight decline in the grade towards the south.

On August 10, 1906, the freight train on which Patrum was a brakeman came in on the passing track and stopped. The engine was cut off from the train it was pulling and sent over to the north end of the stock track. There were two or more cars on the stock track, one a car loaded with hogs, and one an empty car, the loaded car being between the engine and the empty car. The train men intended to pick up the stock car. Another freight train had come up, which was standing on the main line at the time.

At least one attempt was made to couple on to the stock car before the accident occurred. In this attempt the stock car was pushed back against the empty car and the empty car commenced to roll south. Patrum, in the discharge of his duties, climbed upon the empty car and commenced setting the brake. While setting the brake he had hold of the iron wheel and was facing towards the north in a stooping posture. At this juncture, Young, the head brakeman, was at the north end of the train, signaling the engineer to back up, and Vosbury, the conductor of the train on the main line, was at the south end of the stock car. Tripp who owned the hogs on the stock car was in the cab of the engine. The distance between the stock car and the empty car was some six or eight feet. About the time Patrum brought the car he was on to a standstill (it not being clearly shown whether he had fully set the brake), and while he was in a stooping position over the brake, the engine was backed against the stock car and the stock car shoved over the intervening space and against the

car on which Patrum was. Immediately upon the impact of the two cars, Patrum fell, or was thrown from the top of the car, and struck the ground between the two cars. As soon as Vosbury could he grabbed hold of Patrum and tried to pull him off the track, but before he could get him out of the way, the stock car was driven back over him and he died in a few hours thereafter from the injuries received.

Vosbury testified: "Q. When the coupling was made, how far in the rear of that car was the car on which Patrum was on? A. About six or eight feet. Q. When the coupling was made that car of stock, was that car of stock sent back toward the south? A. Yes, sir; they backed up about a car length or a car length and a half. Q. How far did they back the car upon which Patrum got, before it stopped? A. About a car length or a car length and one-half. . . . Q. What is the length of a car? A. About 30 feet, 32 feet and some 36 feet. Q. It would have been about 50 feet? A. Some 40 or 50 feet." Young testified: "Q. You saw him (Patrum) in that position? A. I think I saw him in that position. Q. I will ask you whether or not you gave any signal to the man in charge of the engine which was handling this string of cars? A. When he was on top of the car? Q. Yes, sir. A. Certainly I did, when I went to make that coupling. . . . Q. Who was in charge of that engine? A. Mr. Howard. Q. Is he an engineer? A. No, sir. Q. In what capacity is he employed? A. A fireman. Q. Was the engineer on the engine at that time? A. No, sir. Q. Was there anybody else on the engine at that time? A. Not that I know of. Q. I will ask you, Mr. Young, when you gave this heavy signal to Mr. Howard, whether or not Mr. Howard backed up heavy and hard? A. Well, he struck the car a little bit harder than any other time? Q. I will ask you, Mr. Young, to get the jury to understand it thoroughly, you say these cars were moved by this last stock car? A. Well, yes, about

eight or ten feet when the last coupling was made. Q. You think they struck with a little more than usual force? Q. What did you mean when you testified they hit a little hard? A. On account of the engine being new and a little hard to handle, when you gave her a little steam she was a little hard to handle. Q. Is a new engine a little harder to handle? A. Yes, sir. . . . Q. I will ask, you, Mr. Young, how far a car, a freight car, is ordinarily moved, or how far is it necessary that it should be moved in an attempt to make a coupling in driving other cars against it, within what distance is it supposed to keep, in an attempt to make a coupling? A. Well, most of the time we make a coupling it don't move two feet, and sometimes we make a coupling and move six, eight or ten feet."

Tripp testified: "Q. Did you see him (Patrum) fall off? A. Yes, sir, he was in this position (indicating) setting the brake and he went head down between the cars, and the man that was handling the engine says—he made the remark when Mr. Patrum fell, he said: 'God damn it, we have killed a man,' and I says, 'What,' and made from the engine. . . . Q. I will ask you how far this stock car and this empty car were driven by the last attempt to couple, how far were they moved? A. Well, as well as I remember, in the neighborhood of as far as from here to the corner of the building, may be further (indicating). Q. Before they backed the last time, what was the distance between this stock car and the last car? A. I think something like a car length, something like that. . . . Q. I will ask you whether or not that blow which this string of cars struck this stock car and empty car was a hard blow, or a heavy one? A. Well, I considered it a hard jolt. Q. You considered it a hard jolt? A. Yes, sir." Cross-examination: "Q. You don't know whether it was struck with any more force than was necessary

146 App.—22

to make a coupling? A. Well, I don't know, I know it was harder than they had been handling trains. Q. They had made two or three attempted couplings? A. Yes, sir. Q. And this one was a little harder? A. Yes, sir, a good deal. Q. You don't know whether it was harder than necessary, not being a railroad man? A. Yes, I thought it was handling my hogs hard. Q. You don't know whether it was more than necessary or not? A. I wouldn't say, but I considered it too hard. Q. You never had any experience as a railroad man? A. Nothing more than I had been around the yard a good deal. Q. You are a farmer? A. No, sir, a livery man and shipped a good deal of stock from there. . . . Q. You don't mean to say the engine or cars were handled in any unusual manner? A. Nothing more than I believe they was hit too hard in coupling. Q. Although not being a practical railroad man you don't know whether your opinion is correct or not? A. Well, no, not a railroad man, but I have seen them couple so much I thought that was pretty hard. . . . Q. And it is possible you might be mistaken about the other? A. No, sir, I am not, because when a man swears the cars was handled carefully and knows they wasn't, there is something wrong about it somewhere." Johnson, a conductor employed by the defendant, testified: "Q. Where were you on that day (August 10, 1906)? A. In fifteen or eighteen cars of that spot. Q. Are you familiar with the lay of the tracks there at that station? A. Yes, sir. Q. I will ask you if you know what Patrum was doing at the time he was killed? A. No, sir, I don't know what he was doing. Q. I will ask you whether or not the stock track and switch track at Mansfield are level or do they incline one way or the other? A. I think they are down grade, east, down a hill what we call would be east, or south. Q. About what is the grade there? A. Well, if you get a car started it will run, and if you give it a shove it will keep going quite a piece. Q. Now, I will ask you how long you have

been in the railroad's service as a brakeman? A. About seven years and have been running a train about eighteen or nineteen years. Q. Are you familiar with the nature of making couplings of cars, etc.? A. Ordinarily, I guess. Q. I will ask you, Mr. Johnson, where ordinarily, reasonable care and skill is used by railroad men in handling an engine and cars in making a coupling, within what distance is it necessary to move a car that is standing on a track, such as the track you testified to, as at Mansfield, with reference to its slope, and backing against the car upon such grade, and the car standing still, what distance is it necessary to make that coupling to drive that car? A. Well, I would say about eight or ten feet. Q. You think you couldn't make a coupling without driving that far with these patent couplings? A. I think it would be necessary to drive a car eight or ten feet, it has been done closer, but that is the ordinary distance used."

The action is brought under the provisions of section 2864, chapter 17, Revised Statutes 1899, as amended by Session Acts of 1905, page 135, which provided if there was negligence the fact that it was the negligence of a fellow-servant is not a defense.

The main contention of defendant is that the trial court refused to rule that the chance of such an accident as happened was one of the risks that Patrum assumed, or that the question whether the defendant was liable depended on whether the engine and cars were handled in the usual and ordinary way. The trial court held that the defendant's liability depended on whether the engine and cars were handled with ordinary care, that is with the care that prudent men would exercise under the same circumstances, and not upon whether they were handled in the usual and ordinary manner. The standard by which the conduct of the defendant's employees in this case should be ascertained and measured is that of an ordinarily prudent person under like circumstances. [Wilkins v. St. L. I. M. & S. Ry. Co., 101

Mo. 93; Doss v. M. K. & T. Ry. Co., 135 Mo. App. 643; Heberling v. Warrensburg, 204 Mo. l. c. 615; Texas & P. R. Co. v. Behymer, 189 U. S. 468.]

The difficulty we have had in deciding the case is due to the uncertainty in the evidence rather than to the rule of law that governs. A certain amount of bumping, jarring and jerking is well known to be incidental to the making up of trains, and under ordinary circumstances cannot be complained of. Negligence is not to be inferred from the mere fact that Patrum was thrown from the car by a sudden jar in coupling. And under the authorities in this State the testimony of Tripp, a non-expert, to the fact that the jolt was an unusual one, has little, if any, probative value. [Ray v. Chicago, B. & Q. Ry. Co., 126 S. W. 543.]

But we think that there was substantial evidence adduced tending to prove that the engine was driven back against the stock car and the stock car against the car Patrum was on with unusual, extraordinary and unnecessary force, such as is not usually incident to the careful and efficient making up of trains. The evidence tends to show that Patrum was known to be in a position where any sudden and unusually violent bump might be dangerous to him, and the engine was backed with such force as to drive the loaded car over six or eight feet of space and against another car and then drive both cars a distance of some forty or fifty feet, when it was not necessary to move such stock car over eight or ten feet to make the coupling. It is true that there was evidence tending to show that there was nothing unusual about this coupling, but the jury refused to find that such was a fact. Under such circumstances we cannot say that the jury was not warranted in finding that the engine and cars were handled negligently. If they were handled negligently, Patrum did not assume the risk of that negligence. [Tinkle v. St. Louis & S. F. R. R. Co., 212 Mo. 445; Doss v. M. K. & T. Ry. Co., 135 Mo. App. 643; Texas & P. R. Co. v. Behmeyer, 189 U. S. 468.]

We have considered the other rulings and failures to rule complained of by defendant and discover no reversible error.

The judgment of the trial court is affirmed.

*Gray, J.,* concurs. *Nixon, P. J.,* dissents; files opinion and requests the cause be certified to the Supreme Court, which is so ordered.

## DISSENTING OPINION.

NIXON, P. J.—We are unable to agree with the opinion of the majority. The injury received was an incident to the service in which plaintiff's intestate was engaged and arose from the risk ordinarily incident to the employment of a brakeman. The accident was caused by the coupling of cars of a freight train which is usually effected by thrusting or jamming them together, causing a violent jar or impact, and consequently in such act there would always be danger to a brakeman on the top of one of the cars setting the brake at the time of such coupling. The deceased brakeman had twelve or more years' experience in the business and knew its risks and hazards. The law of the case, as we see it, is correctly stated in the following cases: Williams v. St. L. & S. F. R. Co., 119 Mo. 316, 24 S. W. 782; Young v. Mo. Pac. Ry. Co., 93 Mo. App. l. c. 275; Ray v. Chicago, B &. Q. Ry. Co., — Mo. App. ——, 126 S. W. 543. Nor is much probative force to be attached to witness Johnson as an expert. It was not shown that he ever saw a car coupled on the grade at Mansfield where the accident occurred; nor did the hypothetical question state the length of the train or other conditions necessary to enable him to give an intelligent opinion.

We are of the opinion that the decision reached is in conflict with the above cases defining and applying assumed risk and the cause is accordingly certified to the Supreme Court for its decision.